[Crim. No. 6000. Second Dist., Div. Three. Dec. 11, 1957.]

THE PEOPLE, Respondent, v. LYNN SPEAKS, Appellant.

W. P. Butcher for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, Vern B. Thomas, District Attorney (Santa Barbara), and John G. Barnes, Jr., Deputy District Attorney, for Respondent.

VALLÉE, J.—Defendant Lynn Speaks was accused by information of the crime of manslaughter in that on February 22, 1957, she unlawfully, without malice, killed Allen Buck.[1] She was tried by the court sitting without a jury. On stipulation the cause was submitted on the evidence taken at the preliminary examination and that two police officers would testify that the deceased's reputation in Santa Barbara for violence and aggressiveness while intoxicated was bad. After the court had read the transcript of the preliminary, on motion of defendant the cause was reopened with the understanding that the People had the right of rebuttal. Defendant was

---

[1]The charge was under section 192, subdivision 1, of the Penal Code which reads:

"Manslaughter is the unlawful killing of a human being, without malice. It is of three kinds:

"1. Voluntary—upon a sudden quarrel or heat of passion."

found guilty as charged and sentenced to state prison. She appeals from the judgment.

On February 22, 1957, defendant was employed by Kelly Myers, a sickly man 71 years of age, as a practical nurse. She had been so employed about two months. Myers occupied an apartment on Chapala Street in Santa Barbara. The rear of the apartment opened into an alley. Defendant lived in the apartment and nursed Myers. In the early evening of February 22 the deceased, Allen Buck; Charles LePage; Hattie Valenzuela who was crippled with arthritis; Kelly Myers; and defendant were together in Myers' apartment.

### The Evidence at the Preliminary.

Charles LePage, called by the People, testified: A little after 6 p. m. on February 22, 1957, the five persons named above were in the living room of Myers' apartment. Buck was intoxicated. Defendant had been drinking ''a little.'' She was not intoxicated. Buck stood up, grabbed the crippled hand of Hattie Valenzuela, started to pull, and she screamed. Defendant got up and tried to stop him. Buck ''seemed to be mad.'' A quarrel and scuffle started. Buck started after defendant. He tried to grab and hold Buck. The scuffle started in the living room and gravitated to the kitchen. In the kitchen he saw defendant strike Buck with a knife; it appeared to strike his shoulder. Buck ''was making for her when she did it''; ''he [Buck] was very angry.'' He does not know where defendant got the knife. All of a sudden he saw it. Buck took a few steps, slumped down on the kitchen floor, and he ''kind of lifted'' him (Buck) into the alley and laid him down. Defendant called a taxi. She was going to take Buck to his mother's. When she returned from calling the taxi ''she said something about she struck twice.''

The autopsy physician testified Buck was in his late fifties, was about 5 feet 10 inches tall, weighed about 150 pounds, ''he was fairly well muscled and filled out.'' The cause of death was a stab wound of the heart.

A physician, called by defendant, testified: Defendant arrived at Cottage Hospital in Santa Barbara at 10 a. m. on February 27, 1957. At 11 a. m. a technician took an electroencephalogram of her. In giving the electroencephalogram, 14 to 18 27-gauge pointed wires were inserted in defendant's scalp a distance of $\frac{1}{4}$ to $\frac{3}{8}$ of an inch. The wires are painful. The procedure took about 35 minutes. Defendant was accompanied by a police officer.

Kelly Myers, called by defendant, testified: He was 71 years old. Defendant was his nurse. Buck was "a natural drunkard." Buck had said he could whip the best of them when he was drinking. A week before February 22 in his (Myers') apartment Buck hit defendant on the arm with his fist and "fought her for a little while." On the evening of February 22 Buck left the apartment and came back. When Buck came back, he was drunk; he had a half pint of whiskey; he grabbed Hattie Valenzuela's "crippled hand, and twisted it around, and she was hollering bloody murder, and everything else." Defendant "was sitting on the cot, and she tried to get him to behave himself and turn her loose and go home." Buck was angry, and called defendant "a son-of-a-bitch or something." He (Myers) went into the kitchen, he "wanted to get away from him (Buck), he was worrying me, you know, and I was nervous." Buck went into the kitchen, he wanted him (Myers) to run Hattie Valenzuela out of the house. After that defendant went into the kitchen. Buck told him (Myers) he was going to throw him into the alley. Defendant said to Buck, "Buck, you can't talk to Kelly that way," told him to get out and go home and tried to push him out of the kitchen. Just before defendant pushed Buck, she appeared to be frightened; she had just come out of a fit, "she fell on the floor when she had the fit," "she was chewing her tongue and laying there on the side of her face"; he got a spoon, stuck it in her mouth, she chewed on it a little bit and finally came out of it. Buck was there at the time, he just stood "and looked at her, wouldn't do nothing, said she was faking." She had had three fits the day before. She had the fit about 4 or 5 minutes before the scuffle. Buck "grabbed at her or lunged at her or grabbed at her. I thought he was going to try to choke her"; "he grabbed at her first before ever she done anything at all." At the time he grabbed at her, she had made no move to push him. Buck said he would " beat hell out of her." Defendant tried to open the drawer of the kitchen table in which there were knives; he told her, "No, don't do that, Lynn, don't. And she didn't get no knives out of the drawer." He did not see defendant pick up a knife or see one in her hand. When Buck fell he was coming at defendant, "grabbing for her throat."

## The Evidence at the Trial.

After the court had read the transcript of the preliminary examination and the cause had been reopened, defendant was called as a witness in her own behalf. She testified that about

a week prior to February 22, in Myers' apartment, Buck hit her on the left breast, knocking her across a bed. In the latter part of January 1957 Buck cut the end of her finger with a knife and she ran outside. In November 1956 he tried to choke her, blacked both her eyes, and made her nose bleed. On these occasions Buck had been drinking. The evening of February 22, 1957 Buck was drunk. Just before she stabbed him he appeared like a maniac; she was deathly afraid he was going to kill her.

On cross-examination, in response to leading questions, defendant testified that when she stabbed Buck she believed she was acting in self-defense; she always believed that that's the way she was acting; "Q. So you have had no guilty feeling, then, about what you did on that evening, have you? A. No."

Defendant was further questioned on cross with respect to what she had said in response to questions of Lieutenant Peck and Officer Thuren of the Santa Barbara police department in an interrogation conducted by them in the police station beginning about 8:15 on the evening of February 22. Counsel for defendant objected to the questions on the ground, among others, that a proper foundation had not been laid in that there was no showing the statements were made freely and voluntarily. The court stated, "That's a matter for the defense" and overruled the objection. Of course the law is precisely to the contrary.

Defendant was next cross-examined with respect to what she had said in response to questions of Mr. Barnes, one of the deputy district attorneys who prosecuted the case, and Lieutenant Peck in the police station at 3:15 a. m. in the morning of February 23. Counsel for defendant objected. A deputy district attorney said it was an inconsistent statement which bore on defendant's state of mind. The following then occurred: "THE COURT: It is admissible for the purpose of impeachment, if that's what you wish. MR. MCCARTHY [deputy district attorney]: Yes. THE COURT: You may have it answered for that purpose and that purpose alone."

Defendant's answers to the questions asked her at the police station on the evening of February 22 and the interrogation at 3:15 a. m. on February 23 were in essence that she had not stabbed Buck, that when she saw him lying in the alley she thought he had just passed out because he was so drunk he could not stay up; that she had not had any trouble with Buck "last night" and he had done nothing to make her afraid of him. When questioned on cross-examination as to

whether she had answered the questions as related by the deputy district attorney, she said, "I don't know; I was in such a nervous state that I don't know just exactly what I did say."

Defendant was next asked on cross if she had not told a doctor in the psychopathic ward of the Santa Barbara General Hospital on February 26 "that somebody probably LePage, had assaulted Buck." She answered, "I did not recall making that statement." The cross-examination continued and defendant testified: she guessed she struck Buck twice, she was not sure; when she saw Buck coming toward her from the back porch was when she "became so frightened"; when she stabbed him he was coming at her with both of his hands right out; LePage did not have hold of Buck's right hand pulling it backwards at the time she struck Buck.

Defendant was next asked on cross if on February 27, 1957, at about 7:30 p. m. in the police department in the presence of the deputy district attorney who was cross-examining her at the trial, Lieutenant Peck, a shorthand reporter, and a Mr. McVarish she had not been asked the following questions and given these answers: "Q. Well, where was he [Buck] standing? A. He was standing out on this little porch, and as I can remember, he seemed to have one hand on the side of the door frame and Mr. LePage was holding the other arm. Q. Which hand did he have on the side of the door frame—his right or his left hand? A. Well, it would have been his left hand." Counsel for defendant objected and made an offer of proof.[2] The court overruled the objection and denied the offer of proof, stating it was a matter

[2]The objection and offer of proof were:

"MR. BUTCHER: This was on the 27th day, almost a week after this woman's apprehension. We object to the question on the grounds that there is no proper foundation laid to show, your Honor, that this was a voluntary statement. It is not proper cross-examination. I offer proof to show through this witness that she had been detained from the 22nd day of February until the night in question here on the 27th when this attempted admission was made by the prosecution, in jail and part of that time, your Honor, in that vile dungeon down there known as the Woman's Quarters in the City Hall; part of the time in the Psychopathic Ward of the County of Santa Barbara; part of the time with Dr. Wentz being given an electro-encephalogram, the procedure of which is shown in the preliminary testimony and that while she was out at the Psychopathic Ward she was confined among the insane people out there. She was not taken before a committing magistrate, and therefore, your Honor, this entire statement is a product of brain washing, a product of involuntary coercion, rather, psychological coercion and the statement cannot possibly be held to be voluntary, and I think that we have a right to go into that question at this stage of the proceedings."

counsel for defendant might go into on further direct examination. Defendant answered, "I do not recall." Referring to the interrogation at the police station about 7:30 p. m. on February 27, defendant also testified on cross: "Q. By Mr. Barnes: In that same conversation and at all times prior thereto, Mrs. Speaks, you offered no explanation for having, —for your reason for stabbing Mr. Buck, did you? A. I offered no reason, no. Fear was the only reason. Q. You didn't offer that reason of fear at that time, though, did you? Mr. Butcher: What time, your Honor? We object. Q. By Mr. Barnes: At any time? A. I had told that, you, and all of them there, that I was definitely afraid of Mr. Buck." Defendant was next asked if in the interrogation of February 27 she had not been asked this question and had given this answer: "Q. Can you offer any reason for stabbing Buck? A. No, I can offer you quite a few reasons for not stabbing him." She replied that she did not recall.

On redirect defendant testified: As soon as she discovered Buck was dead she telephoned the police. She was arrested almost immediately and lodged in the women's quarters of the city jail. She described the women's quarters as two cells in the basement. They were dingy, damp, and dark. There was no soap. Other inmates, some drunks, came and left. While she was confined there she was questioned night and day by various ones. On the night she was arrested she asked Lieutenant Peck of the Santa Barbara police department for an attorney. She told him she wanted to speak to Mr. Baker. He said, "You mean Mr. Butcher, don't you?" She said, "Yes, I believe it is Butcher." One of the deputy district attorneys who prosecuted defendant was present. He asked Lieutenant Peck, "Can you arrange a telephone call." Peck replied, "Yes, we can arrange to have her phone Mr. Butcher." She asked for a glass of water and to lie down. She was very sick at the time. She talked to the matron about getting an attorney; the matron told her to talk to the policewoman who was on through the day; "and when I asked for a lawyer, I was never given an answer, and I wasn't allowed to make a phone call out of there, the days that I was in the City Jail." No one called for Mr. Butcher or any other attorney.

Defendant further testified on redirect: She suffers from epilepsy. On the night Buck was killed she had a seizure; she lost consciousness. When she came out of the seizure she was "very hazy." Buck pulled Hattie Valenzuela's fingers out by "pulling and jerking on her." Hattie "screamed at the

top of her voice." She (defendant) was trying to get him to turn Hattie loose. That is when she had the seizure.

Defendant further testified on redirect: On February 26 in the afternoon she was taken to the psychopathic ward of the General Hospital and confined there under armed guards with other inmates until she was taken to court. She could hear the inmates day and night. An objection was improperly sustained as to what she heard. On the 27th Lieutenant Peck and other officers took her in her pajamas and robe to Cottage Hospital where she was given an electroencephalogram. The needles caused her pain "besides when the technician strapped glasses on my face with adhesive tape and then pulled the adhesive off." She was then returned to the psychopathic ward. That evening she was taken back to the city jail.

On recross defendant was asked with respect to the time she was in the city jail and talked to the matron about calling Mr. Butcher: "As a matter of fact, you didn't have any means of hiring an attorney, did you?" She replied, "No, I didn't." She further testified that before she made the statement at the police station on February 27 she had not been made any promises, no threats had been made to her.

Lieutenant Peck was called by the People in rebuttal and asked if on February 27, 1957, at about 7:30 p. m. in the presence of deputy district attorney Barnes and others "the following questions [were] asked and were the following answers given by the defendant?" Counsel for defendant objected. The following then occurred: "MR. MCCARTHY: Mr. Barnes asked Mrs. Speaks if the following questions were not asked. THE COURT: Impeachment. MR. BARNES: We offer it, your Honor, also in rebuttal. The lieutenant can answer the question, yes or no. THE COURT: All right, you may proceed." Peck then testified the questions asked defendant on cross-examination and the answers given by her had been asked her and she had given the answers on February 27. The same procedure was followed with respect to questions asked defendant and the answers given by her in the police station about 8:15 p. m. on February 22 and at 3:15 a. m. on February 23. Peck testified that after the 3:15 a. m. interrogation on February 23, the conversation set out in the margin occurred with respect to calling an attorney.[3] On

[3]Defendant "requested permission to call an attorney and she was told we could make arrangements for her to call an attorney. Q. Did you? A. On the way from the interrogation room within a few minutes after she talked about it, —within a very short time, she requested to lie

the morning of February 27 Lieutenant Peck took defendant from the psychopathic ward to Cottage Hospital in Santa Barbara. The testimony he gave with respect to the interrogation on the evening of February 27 was a small part of the transcript of that interrogation. Mr. McVarish talked to her about 20 or 25 minutes prior to the transcript.

The physician in charge of the psychopathic ward of the General Hospital testified that on February 26, 1957 defendant told him that "between the time of going to make the telephone call for the taxi that someone, probably LePage, had assaulted Buck; that she returned to make another telephone call, this time to the Police."

As mentioned, it was stipulated that if called two police officers would testify that Buck's reputation in Santa Barbara for violence and aggressiveness while intoxicated was bad.

It was also stipulated that defendant was arrested on February 22, 1957, and not taken before a magistrate until February 28, 1957.

Respondent infers that the statements purportedly made by defendant in the early evening of February 27 did not amount to a confession. A confession is a voluntary statement that was made by one who is a defendant in a criminal trial, at a time when he was not testifying in that trial, by which he acknowledged certain conduct of his own that constituted a crime for which he is on trial, a statement which, if true, discloses his guilt of that crime and excludes the possibility of a reasonable inference to the contrary. (*People v. Ferdinand*, 194 Cal. 555, 568-569 [229 P. 341]; *People v. Skinner*, 123 Cal.App.2d 741, 749 [267 P.2d 875].) The purported statements of defendant made in the early evening

down. We took her back. I walked back to the Police Woman's Office with her, told her that she could call an attorney if she wished. She stated that it was rather early in the morning. She had no money. She couldn't afford to hire one, and she didn't desire to call at that time."
"Q. By Mr. Butcher: Repeat what she told at this point. A. After she was accused of stabbing Mr. Buck, she said, 'I am not going to say anything more' or words to that effect, until she can talk to a lawyer. We asked her what lawyer she wanted. She thought she wanted to call Mr. 'Baker.' Mr. Barnes told her there was no Mr. Baker who was an attorney in the City and she replied that she thought it was a Mr. Butcher. Mr. Barnes asked me if arrangements could be made for her to call Mr. Butcher and I said, 'Yes, we can arrange to have Mrs. Speaks call Mr. Butcher.' Q. You did not make the arrangements, did you? A. Yes, we did. Q. To call me? A. Yes. She didn't desire to call you. Q. I know, but did you personally call me? A. No. She didn't ask me to. Q. She asked you to in the interrogation room, didn't she? A. No, she did not. Q. But you knew she wanted an attorney at that point? A. We gave her permission to use the telephone."

of February 27 were broad enough to comprehend every essential element necessary to make out the case against her. When considered as a whole, they amount to a confession. Defendant purportedly told the deputy district attorney and the police she had stabbed Buck and that she had not done so in self-defense. The statements constituted an admission of guilt. (*People* v. *Koenig*, 29 Cal.2d 87, 91 [173 P.2d 1].)

Procedure similar to that followed in the present case—introducing the alleged confession by way of impeachment and in rebuttal without proof that it was voluntary—was condemned in *People* v. *Rodriguez*, 58 Cal.App.2d 415 [136 P.2d 626], in which this court said (p. 418):

"The alleged confession to Officer Story was not offered as a part of the People's case in chief. It was held back, to be offered in rebuttal and in the guise of impeachment of defendant after his denials upon cross-examination. Apparently both counsel and the court considered this to be a proper procedure. Not only that, but it appears to have been assumed that a confession elicited by way of impeachment was admissible without proof that it had been given voluntarily. The procedure was entirely wrong. If the defendant had confessed, proof of the confession was a part of the case of the People and it was the duty of the district attorney to offer it before resting his case, when the testimony was then available and there was no reason for not offering it in chief. When the case of the People is closed and the defense is in, the remainder of the People's case is limited to evidence in rebuttal of that produced by the defense and should be so limited by the court, except where a proper showing is made for reopening the case in chief for the receipt of further evidence. The People have no right to withhold a material part of their evidence which could as well be used in their case in chief, for the sole purpose of using it in rebuttal. Evidence as to statements of the accused tending to show his guilt was admissible to establish the truth of the facts stated. Evidence offered to show contradictory statements of a witness or to otherwise impeach him is received because it bears upon the credibility of the witness and not for the purpose of proving the truth of the statements which are contradictory of the witness' sworn testimony. The alleged confession was offered to establish facts constituting guilt; the impeachment feature was incidental and comparatively unimportant. It was no more proper for the district attorney to offer the evidence as rebuttal after defendant's denial of the alleged

statements, under the pretense that it was offered to impeach the defendant, than it would have been to offer it in rebuttal if the defendant had not been questioned about it at all.''

Another erroneous ruling was that the court refused to require the district attorney to show defendant the transcript of the interrogations from which he was questioning her, purportedly for the purpose of impeachment, while she was on the stand. (Code Civ. Proc., §§ 2052, 2054.)

The vital question is whether the requirements of due process under the Fourteenth Amendment and article I, section 13, of the California Constitution were satisfied because of the admission in evidence of defendant's alleged confession. Defendant properly challenged the People's right to utilize the confession consistently with rights guaranteed her by the due process clauses of the United States and state Constitutions.

The use of a confession, obtained by either physical or psychological coercion as a means of obtaining a finding or a verdict of guilt, constitutes a violation of the due process clauses of the United States and state Constitutions.[4]

Due process requires ''that this reviewing court go behind the verdict to the extent of making our own determination as to whether the confessions were coerced. In making this determination we do not weigh the evidence as a trier of fact. Rather, we accept as true that portion of the evidence of coercion which is uncontradicted.'' (*People* v. *Baldwin,* 42 Cal.2d 858, 867 [270 P.2d 1028]; *People* v. *Millum,* 42 Cal.2d 524, 527 [267 P.2d 1039].)

Before a confession is admissible it must be shown by the prosecution that it was voluntary.[5] At bar the evidence

---

[4]*Brown* v. *Mississippi,* 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682]; *Chambers* v. *Florida,* 309 U.S. 227 [60 S.Ct. 472, 84 L.Ed. 716]; *White* v. *Texas,* 310 U.S. 530 [60 S.Ct. 1032, 84 L.Ed. 1342]; *Ward* v. *Texas,* 316 U.S. 547 [62 S.Ct. 1139, 86 L.Ed. 1663]; *Ashcraft* v. *Tennessee,* 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192]; *Malinski* v. *New York,* 324 U.S. 401 [65 S.Ct. 781, 89 L.Ed. 1029]; *Haley* v. *Ohio,* 332 U.S. 596 [68 S.Ct. 302, 92 L.Ed. 224]; *Lee* v. *Mississippi,* 332 U.S. 742 [68 S.Ct. 300, 92 L.Ed. 330]; *Watts* v. *Indiana,* 338 U.S. 49 [69 S.Ct. 1347, 93 L.Ed. 1801]; *Turner* v. *Pennsylvania,* 338 U.S. 62 [69 S.Ct. 1352, 1357, 93 L.Ed. 1810]; *Leyra* v. *Denno,* 347 U.S. 556 [74 S.Ct. 716, 98 L.Ed. 948]; *Commonwealth of Pennsylvania* ex rel. *Herman* v. *Claudy,* 350 U.S. 116 [76 S.Ct. 223, 100 L.Ed. 126]; *Fikes* v. *Alabama,* 352 U.S. 191 [77 S.Ct. 281, 1 L.Ed.2d 246]; *People* v. *Stroble,* 36 Cal.2d 615, 622-623 [226 P.2d 330]; *People* v. *Millum,* 42 Cal.2d 524, 526-527 [267 P.2d 1039].

[5]*People* v. *Jones,* 24 Cal.2d 601 [150 P.2d 801], says (p. 608): ''Before a confession is admissible it must be shown by the prosecution that it was voluntary, and made without any previous inducement or by reason of any intimidation or threat. [Citations.] The admissibility of a confession is preliminarily a question for the trial court to determine.

of the confession was received over objection without any effort having been made to show that it was voluntary. In fact the court overruled defendant's objection to its reception in evidence made on that ground, saying it was a matter of defense.

■ The requisite of voluntariness of a confession is not satisfied by establishing merely that the confession was not induced by a promise or a threat. A confession is voluntary in law if, and only if, it was voluntarily made. (*Ziang Sung Wan* v. *United States*, 266 U.S. 1 [45 S.Ct. 1, 69 L.Ed. 131, 148].) ■ To be free and voluntary, it must not be produced by hope or fear, or by the exertion of any improper influence. (*Bram* v. *United States*, 168 U.S. 532 [18 S.Ct. 183, 42 L.Ed. 568, 573]; *Turner* v. *Pennsylvania*, 338 U.S. 62 [69 S.Ct. 1352, 1357, 93 L.Ed. 1810, 1813].)

Section 825 of the Penal Code provides: "The defendant must in all cases be taken before the magistrate without unnecessary delay, and, in any event, within two days after his arrest, excluding Sundays and holidays. . . ."[6]

■ "Detention beyond the 48-hour statutory maximum without being taken before a magistrate is unquestionably illegal." (*Rogers* v. *Superior Court*, 46 Cal.2d 3, 9 [291 P.2d 921].)

■ The effect of the mere fact that an accused is unlawfully detained by the police in violation of state law on the admissibility of a confession in a state court is governed solely by state law. ■ Violation of the mandate that a defendant be taken before a magistrate within the time prescribed by section 825 without coercion does not render a confession inadmissible. Nevertheless, such violation is "relevant circumstantial evidence in the inquiry as to physical or psychological coercion." (*Stein* v. *New York*, 346 U.S. 156 [73 S.Ct. 1077, 97 L.Ed. 1522, 1544]; *Rogers* v. *Superior Court*, 46 Cal.2d 3, 10 [291 P.2d 921].)

---

[Citations.] But before a confession is admitted there must be evidence from which it is possible to determine that the confession was voluntarily made. [Citation.] While the weight of the evidence addressed to the circumstances surrounding the obtaining of a confession is to be determined preliminarily by the trial court, the circumstances constituting improper influences that would exclude a confession present questions of law, reviewable by an appellate court."

[6]Section 145 of the Penal Code provides: "Every public officer or other person, having arrested any person upon a criminal charge, who willfully delays to take such person before a magistrate having jurisdiction, to take his examination, is guilty of a misdemeanor."

 There is no conflict in the evidence with respect to the issues on which the admissibility of the confession depends. The voluntariness of the confession does not depend on disputed questions of fact. The facts are not only undisputed, they are admitted; they come from the prosecution itself. We are compelled to conclude that defendant's alleged confession was not voluntary, but coerced. Shortly before defendant's arrest she had an epileptic seizure. The night of her arrest she was kept up nearly all night. The officers began to question defendant as soon as they reached the city jail. They questioned her at 8:15 p. m. the evening Buck was killed. Defendant persistently denied she had killed Buck. Not satisfied with their interrogation, the police obtained the services of a deputy district attorney; and at 3:15 a. m. in the morning of February 23, interrogated her again until she was so exhausted that she asked for water and begged to lie down. During this interrogation defendant persistently denied she had killed Buck. From February 23 until February 26 she was kept in a damp, dingy, dark cell in the basement of the city jail with drunks coming and going. Defendant testified that during this period she was questioned by the police. Her testimony was not contradicted. On February 26 the police, no doubt with the approval of the deputy district attorney, took her to the psychopathic ward of the county hospital where she was confined in a ward with other inmates. As counsel for defendant pertinently asks: "Was it because she was too ill mentally to be subjected any further to an examination, or was it because by that time and as a result of the brain washing, she needed hospital care?" On February 26 she denied to the physician in charge of the psychopathic ward that she had killed Buck. On February 27 the police took her from the psychopathic ward to Cottage Hospital where she was given an electroencephalogram with needles inserted into her scalp $\frac{1}{4}$ to $\frac{3}{8}$ of an inch. The prosecution did not introduce the result of the electroencephalogram in evidence. After the electroencephalogram defendant was returned to the psychopathic ward. That evening she was returned to the city jail and again interrogated by the deputy district attorney and the police. It was then—and only then—that, unprotected and without counsel, she confessed to having stabbed Buck and confessed that she did not do it in self-defense.

Defendant was arrested on February 22 and not taken before a magistrate until February 28, six days after her arrest. She was never informed of her constitutional right to remain

silent, even by the deputy district attorney whose duty it was to protect her rights. (16 Cal.Jur.2d 278, § 11.) Not even a gesture toward getting Mr. Butcher or any lawyer for her was made. The ordinary motive for extended failure to take a defendant before a magistrate is not unrelated to the purpose of extracting a confession. And such it obviously was in this case, else why did not the deputy district attorney inform defendant of her right to remain silent; else why did he not telephone Mr. Butcher and tell him defendant wanted to see him; else why did he not insist that defendant be taken before a magistrate on February 25, 1957, which was a Monday? Else why was defendant taken to the psychopathic ward? Else why was she given an electroencephalogram? Else why did the deputy district attorney participate in the interrogation, seeking a confession, until the evening of the fifth day after defendant was arrested? The deputy district attorney callously disregarded and flouted the ordinary standards of decency; his conduct "shocks the conscience" (*Rochin* v. *California*, 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 190, 25 A.L.R.2d 1396]); he and the police were guilty of flagrant misconduct. It is apparent that defendant was not taken before a magistrate until interrogation (part of which was between 3 and 4 o'clock in the morning); confinement in a damp, dark, dingy basement cell with drunks; confinement with inmates of the psychopathic ward; an electroencephalogram; further confinement in the psychopathic ward; and further interrogation had produced a confession. These circumstances were calculated to break the strongest nerves and the stoutest resistance—particularly of an epileptic woman. Patently, the course pursued by the deputy district attorney and the police told defendant that it was better for her to confess than to persist in denial: a calculated endeavor to secure a confession through psychological pressure.[7]

*Rogers* v. *Superior Court*, 46 Cal.2d 3 [291 P.2d 921], relied

[7]*People* v. *Quan Gim Gow*, 23 Cal.App. 507 [138 P. 918], says (p. 511): "While no physical force was used and neither threats nor promises made, there can be no doubt at all but that the repeated questioning of the officers, like the constant dropping of water upon a rock, finally wore through his mental resolution to remain silent. Admittedly, his refusal at first to answer incriminating questions gave evidence of a desire to make no statement. When did this unwillingness vanish and a desire to talk succeed it? Not after he had been given any period of time for reflection, for his inquisitors allowed him none. The examination was persisted in until a response was forthcoming, and under these circumstances it must be said that the responses appear to have been unwillingly made and as a direct result of continued importuning. . . . The fact that the questioning was done by police officers presents an important

on by respondent, is not helpful. All that case holds in this respect is that illegal detention *alone* does not render a pretrial confession inadmissible.

The confession was clearly the product of mental coercion. The undisputed facts leave open no other possible conclusion but that it was obtained under circumstances which made its use at the trial a denial of due process. The conduct of the deputy district attorney and of the police was patently illegal. (*People* v. *Stroble*, 36 Cal.2d 615, 624-625 [226 P.2d 330].) The only effective weapon against such illegal practices is the exclusion from evidence of confessions illegally obtained.

Too often such practices are condoned by trial courts and are of necessity condemned by reviewing courts. A heavy responsibility in such situations rests upon trial courts. It should be understood to be the duty of the trial court to scrutinize carefully the evidence respecting conditions under which a confession has been obtained. It is difficult for us to understand how the practices disclosed by the evidence escaped the condemnation of the trial court.

The complaint is not of the commission of mere error, but of a wrong so fundamental that it rendered the conviction wholly void. (*Brown* v. *Mississippi*, 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682, 687].)[8] ■ A state may not base a

---

item for consideration in determining whether the admissions extracted were of a voluntary character.''

*People* v. *Dye*, 119 Cal.App. 262 [6 P.2d 313], says (p. 269): ''The circumstances of the questioning, and the method thereof, were well calculated to force a confession of guilt, but the process was not at that time successful. It was only after six hours more of questioning on September 9th, followed by three days more of secret imprisonment, that the confession was finally obtained on the 12th. Considering the wearing-out process of inquisition, the secrecy of the imprisonment, the isolation of the defendant and the unlawful failure to take the defendant before the magistrate (Pen. Code, secs. 821, 824, 849 and 145) the transaction has all the earmarks of a deliberate attempt to force a confession by every means short of promises, direct threats or actual violence. The question presented is this: Can a confession so obtained be accepted as a confession freely and voluntarily given?

''[P. 270.] It is also true that if threats and inducements are made to a prisoner, and within a few days thereafter he makes a confession, such acknowledgment of the commission of the crime may not be introduced in evidence unless it clearly appears that the threats and inducements had ceased to operate upon his mind to bring about his statement of his own guilt. [Citations.] To 'threats and inducements' we think it appropriate to add, any illegal process whereby through external means of pressure the free will of the defendant has been overcome.''

[8]*Ashcraft* v. *Tennessee*, 322 U.S. 143 [64 S.Ct. 921, 88 L.Ed. 1192], says (88 L.Ed. 1200): ''The Constitution of the United States stands as a bar against the conviction of any individual in an American court by means of a coerced confession. There have been, and are now, certain foreign nations with governments dedicated to an opposite policy:

conviction on a confession obtained by coercion. (*Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 190, 25 A.L.R.2d 1396].) It cannot be said that without the confession a different result would have been improbable.

The judgment is reversed.

Shinn, P. J., and Wood (Parker), J., concurred.

On January 8, 1958, a petition for a rehearing was denied, applications to produce evidence and for modification were denied, and the following opinion was then rendered:

THE COURT.—A petition has been filed by the attorney general and the district attorney of Santa Barbara County seeking a rehearing or a modification of our opinion filed herein. After due consideration we find no reason for granting a rehearing.

The request for modification of our opinion is addressed especially to the statement ''The deputy district attorney callously disregarded and flouted the ordinary standards of decency; his conduct 'shocks the conscience' (*Rochin* v. *California,* 342 U.S. 165 [72 S.Ct. 205, 96 L.Ed. 183, 190, 25 A.L.R.2d 1396]); he and the police were guilty of flagrant misconduct.''

It is represented to us that the deputy in question was admitted to the bar in 1954 and that he had been in the office of the district attorney for a little more than two years. The petition characterizes our criticism as a ''personal attack'' upon the deputy and ''unfair in view of his youth and comparative inexperience.'' This is an improper characterization of our treatment of the matter. Our condemnation was of the methods that were employed to coerce a confession from the accused prisoner which we said, and now repeat, were such as to shock the conscience. It is indeed unfortunate that some of the conduct which was the subject of our censure was that of a young, eager and comparatively inexperienced deputy

governments which convict individuals with testimony obtained by police organizations possessed of an unrestrained power to seize persons suspected of crimes against the state, hold them in secret custody, and wring from them confessions by physical or mental torture. So long as the Constitution remains the basic law of our Republic, America will not have that kind of government.''

*Watts* v. *Indiana,* 338 U.S. 49 [69 S.Ct. 1347, 93 L.Ed. 1801], says (93 L.Ed. 1806): ''To turn the detention of an accused into a process of wrenching from him evidence which could not be extorted in open court with all its safeguards, is so grave an abuse of the power of arrest as to offend the procedural standards of due process.''

district attorney. That we were unaware of his youth, and did not suspect it, was due to the fact that we have not observed that the desire to obtain convictions at any cost is less prevalent among experienced and seasoned prosecutors than among the young and inexperienced.

We take it that when a young lawyer enters the office of a district attorney as a deputy he receives instruction and training in his duties as a prosecutor, and particularly in the principles, practices and methods of the office. If, after an experience of two years, he has learned only that his primary obligation to the office is to obtain convictions, his training has been not only deficient but grossly misdirected. It is so with the police. Responsibility must rest primarily with the heads of the offices. We take this occasion to say that our criticism of the methods we have denounced should be understood as applying to the office of district attorney and the department of police, rather than to the individuals involved who presumably learned them from their superiors. We are of the opinion that the actions of the young district attorney while characterized by an excess of zeal were nevertheless in accordance with what he had been taught or had been allowed to believe to be his duties. Our opinion derives support from the fact that in the petition for rehearing, joined in by the district attorney, the methods and practices we have criticized still appear to him to be above reproach.

There is also an application for leave to file affidavits touching upon the practices discussed in our opinion respecting the interrogation of the defendant. The purpose of the application is to obtain a modification of the opinion by withdrawal of the statement that the district attorney and the police department were guilty of flagrant misconduct. We have reviewed the matter in the light of the record and deem it neither necessary nor proper to consider additional facts, other than those pertaining to the youth and inexperience of the deputy district attorney. The application to produce evidence is denied; the petition for rehearing is denied; the application for modification is denied; what we now say is for publication with the opinion.

Respondent's petition for a hearing by the Supreme Court was denied February 5, 1958. Shenk, Acting P. J., and Spence, J., were of the opinion that the petition should be granted.