[Crim. No. 6958. Second Dist., Div. Three. Mar. 16, 1960.]

THE PEOPLE, Respondent, v. ROBERT PATRICK
DAVIS, Appellant.

888

Patrick E. Duggan for Appellant.

Stanley Mosk, Attorney General, and S. Clark Moore, Deputy Attorney General, for Respondent.

FORD, J.—This is an appeal from a judgment of conviction of three counts of burglary and of that portion of The Dangerous Weapons' Control Law (Pen. Code, §12000 et seq.) which is embodied in section 12021 of the Penal Code. The contentions of the appellant relate to the validity of his arrest and detention, the propriety of a search of his place of residence and the seizure of articles therein, and the question of whether the trial court improperly limited cross-examination of a witness for the People. Accordingly, the statement of the evidence will be confined to the portions thereof which have a bearing on such issues.

At the time of trial, trial by jury was duly waived and it was stipulated that the case in chief of the People would be submitted on the testimony taken at the preliminary hearing, the exhibits received at the preliminary hearing to be deemed to be in evidence,[1] but that the People and the defendant could produce such further evidence as each respectively desired.

As set forth in the transcript of the preliminary hearing, Ralph Sapp testified as follows: He was a deputy sheriff of the county of Los Angeles. He arrested the defendant at

---

[1] When all of the testimony had been completed, the defendant made a motion to strike and suppress all exhibits ''on the ground that they were obtained as a result of illegal search and seizure.'' The question was thus presented to the trial court at the end of the trial and not at the time the exhibits were offered in evidence.

15629 South Atlantic Avenue at 11:45 p. m. on April 12, 1959. The officer was driving south on Atlantic Boulevard in a business area with his partner. At approximately 11:30 p. m. he saw the defendant walking away from the vicinity of an automobile which was parked at the curb; the defendant was going toward a nursery. When he first saw the defendant, the defendant was about three feet from the vehicle. The officer lost sight of him and later found him behind some shrubs. The defendant was then on the ground on his hands and knees. The officers ordered him to arise. In response to an inquiry as to what he was doing, the defendant answered that his purpose was to urinate. The witness further testified that: "And we asked further as to his actions. He could not give us any answers or would not give us any answers." Upon examination of the nursery premises, the officer "noted on the ground a couple of indentations from some rolls of bamboo, these being six by fifteen foot rolls of bamboo." Two rolls of bamboo were found in the back of the vehicle at the curb, a 1958 Rambler station wagon. That vehicle was registered to a person other than the defendant. The defendant said that he had not been in the vehicle and he denied knowledge of any items which were in it. The engine of the station wagon was warm. No one else was walking in the vicinity. The defendant was taken to the sheriff's station and placed "under arrest for suspicion of burglary and suspicion of grand theft auto."

The testimony of Charles J. Severs as given at the preliminary hearing may be summarized as follows: He was a deputy sheriff of Los Angeles County and had several conversations with the defendant. At the sheriff's station on the morning and, again, on the afternoon of April 13, the officer talked to the defendant. There was another conversation on April 14 which is pertinent to an issue raised on this appeal. It was followed by the officer going to the defendant's place of residence. The relevant portion of the transcript is as follows: "Q. Where did you talk to him at that time? A. I first talked to him when we removed him from his cell at Firestone Station. We asked him if we would find anything in his home and he stated that no, we would not. I asked him if he would take us there and he said yes, he would. Q. Did you go? A. Yes, sir. Q. When did you go there? A. That was approximately 10:00 A. M. on the morning of April 14th. Q. Who went with you? A. Myself, Deputy Vaughn, and subject Davis. Q. Where did you go? A. We went

on East Fernwood in Lynwood. Q. What is located there? A. That is the residence of the defendant. Q. Did you enter? A. Yes, we did. Q. How did you enter? A. We walked in the front door. Q. Was the door locked? A. No, it was not. Q. What happened after you got inside? A. I asked Mr. Davis if he had any stolen guns and he stated there was some .22's in the rear bedroom. Q. And then what did you do? A. We went to the rear bedroom and saw two or three .22's lying on the floor in the middle of the room. I then asked him if he had any hand guns. He stated there were two or three in the dresser drawer. My partner opened the top right hand dresser drawer in the rear bedroom while myself and Mr. Davis were present and found the .38 six-inch 357 Magnum.'' In addition, certain other articles were found and removed from the premises by the officers. The officer testified that the defendant ''handed us different items of property that we had overlooked.''

The officers had no search warrant at the time they entered the defendant's residence. Various items of personal property so found were involved in the charges of which the defendant was found guilty and were received in evidence as part of the case of the prosecution. Such charges did not relate to the matters which led to the defendant's arrest on April 12.

After the trial court had read and considered the transcript of the preliminary hearing, the defendant testified on his own behalf. He did not recall that the officers said that he was under arrest before they took him to the station but they put handcuffs on him. With respect to the trip to his place of residence, the defendant testified that he gave no consent for the entry and search of his residence.[2] On cross-examination

[2]Such testimony on direct examination was as follows: ''Q. All right. Now, the morning of April 14, 1959, did the officers call you out and talk to you? A. Yes, sir. Q. Did you give them any information other than your name and address? A. No. Q. Did you have any conversation with them with regard to going to the address that you gave them? A. No. Q. What did they do with you, and to you, if anything? A. Oh, they put handcuffs on me and a couple of them took me over to my house. Q. Did they ask you anything prior to going to the house? Did they say, 'Do you want to go?' or—— A. No. Q. They put handcuffs on you, put you in the car, drove to the address you had given them? A. Yes, sir. Q. Was it in a police car? A. No. Q. What kind of a car was it in? A. Believe belonged to one of the officers. THE COURT: The officer that testified in the transcript, it was his personal car. BY MR. DUGGAN: Q. Did you have any conversation with the officers enroute to your address? A. I don't believe so. Q. All right, when you got to the address, did they stop the car? A. Yes, sir. Q. Did you get out? A. Yes, sir. Q. Did the officers get out? A. Yes, sir. Q. Were you still hand-

he testified in part as follows: "Q. And it's a fact, sir, when you did arrive you made no objection whatsoever to the officers' entry? A. I couldn't very well make an objection. Q. I am asking you if you made one? A. No. Q. Inside the house while the officers were uncovering these various items of evidence that you saw offered at the Preliminary Hearing, you made no objection, did you? A. No." On redirect examination, the following testimony was given: "Q. Did they say anything to you? A. Did they say anything to me while I was in the house? THE COURT: At any time, did they say anything to you, tell you what would happen to you if you didn't let them go in, wasn't that your question? A. No."

In rebuttal, Officer Vaughn testified on direct examination as follows: "Q. You are an Investigating Officer in this case, correct? A. Yes, sir. Q. Directing your attention to the 13th day of April, the evening thereof, did you talk to this defendant with Officer Severs who has testified in this case? A. Yes, sir, I did. Q. Did you ask him for permission to go out and look at his house? A. Yes, sir, I did. Q. What did he say at that time? A. I asked him if we could go to his home, if we would find these things, he said 'no.' I said, 'Is it allright if we go out anyway?' and he says, 'Yes, it is.' Q. Did you have another conversation on the 14th immediately before going out to the defendant's home with the defendant? A. Yes, sir, we

cuffed? A. Yes, sir. Q. Did the three of you walk up to the house? A. Yes, sir. Q. Did they ask you if they could enter? A. No. Q. What did they say to you, if anything? A. They didn't say anything. They says, 'This is your house?', and I said, 'Yes,' and one of them asked me if I had a key and I says, 'No' and they opened the door and went in. Q. The door was shut? A. The door was shut. Q. Was this the front door or the back door? A. The front door. Q. Did they ask your permission to enter before they entered? A. No. Q. After you got inside—well, let me ask you this way. Did you go in first or did these two officers go in first, do you remember? A. I don't recall. Q. Anyway, the three of you got inside. A. Yes, sir. Q. Did they ask you to step inside? A. Yes, sir. Q. Was one officer behind you? A. Yes, sir. Q. When you got inside, did they ask you if they could search your house? A. No. Q. Did you give them permission at any time to search? A. No. Q. You were still handcuffed? A. Yes, sir. Q. Were the officers in uniform? A. No. . . . MR. DUGGAN: Were these the officers who interrogated you at the Firestone Station? A Yes, sir. Q. Do you remember how long you were at the house, approximately? A. Over an hour. Q. Then you left the premises and went back to the Firestone station? A. Yes, sir. Q. At any time that you were there, did you give the officers consent either—in any manner, did you give them consent either by telling them that they could search it or in any other way? A. No. Q. While they were searching the house what did they have you do? A. Well, they kept me with them usually. I believe one was in front of me and one behind."

did. Q. Did you ask him then if it was allright to go out and look at his house? A. Yes, sir. Q. What did he say? A. Says, 'Okay, there's nothing stolen in the house.' Q. Now, when you went out to the house and gained entry, looked around, did this defendant raise any objection to your going into the house or looking for any of those items you recovered? A. No, sir, he did not.''

On cross-examination of Officer Vaughn, the following occurred which is the basis of appellant's claim of improper limitation of cross-examination: ''Q. And how long had you been interrogating the defendant prior to the time that you claim he said it was all right for you to go out to his house? Mr. Fitts: Beyond the scope of the purpose for which this witness was called. The Court: Objection is sustained. By Mr. Duggan: Q. Had you talked to the defendant prior to April 13th? Mr. Fitts: This is also objected to as beyond the scope of—— The Court: Objection sustained. . . . Q. You said you had two conversations with the defendant on the 13th? A. Yes, sir, that is correct. Q. What time did the first one take place? A. Approximately 2:10 P. M. Q. How long did that one last? A. I would estimate between five and ten minutes. Q. Who was present besides you and the defendant? Mr. Fitts: We are now talking about the first conversation and I will object to that as being beyond the scope—— The Court: Objection sustained.'' Thereafter, cross-examination as to the second conversation on April 13 at approximately 4:20 p.m. was permitted without objection except as follows: ''Q. What burglary were you holding him on? Then you said you told him he had been arrested for burglary. What burglary was that? Mr. Fitts: Now we are going far afield, Your Honor. I called this witness simply to testify by way of impeachment to the defendant's testimony. The Court: Objection sustained.'' An objection of the People as to any inquiry with respect to the visit to the defendant's place of residence was sustained on the ground that it went beyond the subject-matter of the direct examination.

Thereafter, Officer Vaughn was examined as a witness on behalf of the defendant and testified as to the visit to the defendant's residence.

Whether the arrest of the defendant on the night of April 12 was justified need not be determined on this appeal since the search of his place of residence on April 14 was clearly not incidental to such arrest. (*People* v. *Gorg,* 45 Cal.2d 776, 781 [291 P.2d 469] ; *Hernandez* v. *Superior Court,* 143 Cal.

App.2d 20 [299 P.2d 678].) The propriety of such search must, therefore, rest upon the determination of whether the trial court was warranted in reaching the conclusion that the defendant had consented thereto. (*People* v. *Burke,* 47 Cal.2d 45, 49 [301 P.2d 241].)

■■ The applicable law with respect to the matter of such consent is stated in *People* v. *Michael,* 45 Cal.2d 751, at page 753 [290 P.2d 852] : ''To protect his right to object to an unreasonable search or seizure a defendant need not forcibly resist an officer's assertion of authority to enter his home or search it or his person (*United States* v. *Di Re,* 332 U. S. 581, 594 [68 S.Ct. 222, 92 L.Ed. 210] ; *Amos* v. *United States,* 255 U. S. 313, 317 [4 S.Ct. 266, 65 L.Ed. 654]), but if he freely consents to an entry or search, or voluntarily produces evidence against himself, his constitutional rights are not violated and any search or taking of evidence pursuant to his consent is not unreasonable. (*Zap* v. *United States,* 328 U. S. 624, 628 [66 S.Ct. 1277, 90 L.Ed. 1477] ; *Davis* v. *United States,* 328 U. S. 582, 593-594 [66 S.Ct. 1256, 90 L.Ed. 1453] ; *In re Dixon,* 41 Cal.2d 756, 761 [264 P.2d 513].) ■■ Whether in a particular case an apparent consent was in fact voluntarily given or was in submission to an express or implied assertion of authority, is a question of fact to be determined in the light of all the circumstances.'' (See also *People* v. *Gorg, supra,* 45 Cal.2d 776, 782; *People* v. *Davis,* 48 Cal.2d 241, 249 [309 P.2d 1] ; *People* v. *Fischer,* 49 Cal.2d 442, 448 [317 P.2d 967].)

■ As stated in *People* v. *Galle,* 153 Cal.App.2d 88, at page 90 [314 P.2d 58] : ''While there is reason for the view that a request or a demand by an officer for permission to search premises is to some extent coercive, considered alone, it does not render the consent involuntary as having been obtained by coercion.'' The effect of such request while the defendant is under arrest has been considered in comparatively recent decisions. ■■ Thus, in *People* v. *Robinson,* 149 Cal.App.2d 282, at page 287 [308 P.2d 461], it was said: ''The fact that defendant is under arrest at the time of giving consent is one of the factors, but not the only one, to be considered in determining whether it was freely given; the trial judge who sees and hears the witnesses is best able to pass upon the matter.'' (See also *People* v. *Fischer, supra,* 49 Cal.2d 442, 448; *People* v. *White,* 159 Cal.App.2d 586, 593 [324 P.2d 296] ; *People* v. *Lujan,* 141 Cal.App.2d 143, 147 [296 P.2d 93].)

■■ In the present case, the determination of the credibility of each witness who testified upon the issue of consent

was for the trial judge. The evidence sustains the conclusion reached by him that the defendant consented to the entry and search of his premises. Such conclusion must be upheld here unless it was prejudicially affected by improper limitation of the defendant's cross-examination of the witness Vaughn, a matter to which the attention of the court will now be turned.

It is to be noted that the testimony of the defendant was not that consent to enter and search his residence was given by him as a result of deception or coercion brought to bear on him but rather that he gave no consent at all. In that light, it is difficult to determine the specific nature of appellant's claim of prejudice because of the rulings of the trial court in the course of the cross-examination of Officer Vaughn. Such contention is thus stated: ''On cross-examination, the Defense, time after time, attempted to bring out from the witness if the 'consent' or 'permission' was given free[ly] and voluntarily by Defendant, but upon each six occasions the court erroneously sustained the prosecutor's objections.'' However, it is clear that there was no undue limitation of cross-examination of the officer as to the two conversations in which, according to the officer, the defendant expressed consent to the search of his residence. Moreover, when the defendant called Officer Vaughn as his own witness, he went into the matter of the visit to the residence and, accordingly, cannot complain of any limitation of his inquiry with respect to the same subject when the officer was previously under cross-examination by defendant's counsel. (*People* v. *Weiss*, 50 Cal.2d 535, 555 [327 P.2d 527]; *People* v. *Jefferson*, 84 Cal.App.2d 709, 713-714 [191 P.2d 487]; *People* v. *Sehorn*, 116 Cal. 503, 511 [48 P. 495].) Even assuming that the trial court should have been more liberal in its rulings as to the proper scope of cross-examination, reversible error cannot be found in the absence of prejudice to the substantial rights of the appellant. (*People* v. *Domenighini*, 81 Cal.App. 484, 490 [254 P. 292]; *People* v. *Griffin*, 162 Cal.App.2d 712, 716 [328 P.2d 502].) A careful examination of the entire cause leads to the conclusion that no such prejudice appears in this case. (See *People* v. *Watson*, 46 Cal.2d 818, 834-837 [299 P.2d 243].)

 The appellant complains that certain of his rights were violated by his arrest and detention in jail prior to the filing of the charges against him which resulted in the judgment of conviction from which he appeals. But such a claim, to the extent that it may find a basis in the record, cannot lead to a reversal of a judgment of conviction where, as is

true in the present case, there is no showing of misconduct on the part of law enforcement officers which appears to have materially affected the result of the trial or made the trial itself unfair. (*People* v. *Stroble,* 36 Cal.2d 615, 626 [226 P.2d 330] ; *People* v. *Boyden,* 116 Cal.App.2d 278, 286 [253 P.2d 773] ; *People* v. *Collins,* 117 Cal.App.2d 175, 181 [255 P.2d 59] ; *People* v. *Guarino,* 132 Cal.App.2d 554, 558 [282 P.2d 538] ; *cf. People* v. *Speaks,* 156 Cal.App.2d 25, 37 [319 P.2d 709] ; *People* v. *Grace,* 166 Cal.App.2d 68, 78-79 [332 P.2d 811] ; *Rogers* v. *Superior Court,* 46 Cal.2d 3, 10 [291 P.2d 929].)

The judgment is affirmed.

Shinn, P. J., and Vallée, J., concurred.