[Crim. No. 3426. Third Dist. Oct. 30, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. BARRY MILES SIGAL, Defendant and Appellant.

Allan B. O'Connor for Defendant and Appellant.

Stanley Mosk, Attorney General, Doris H. Maier, Assistant Attorney General, and Raymond M. Momboisse, Deputy Attorney General, for Plaintiff and Respondent.

FRIEDMAN, J.—Appeal from conviction of second degree murder. Once more an appellate court is requested to weigh admissibility of a confession to an unwitnessed murder against claims of police coercion used in producing the confession. ■ Evidentiary use of an involuntary confession is a denial of due process of law, violating both federal and state Constitutions and requiring reversal of the conviction, even in the presence of independent corroborating evidence of guilt. (*Lynumn* v. *Illinois*, 372 U.S. 528 [83 S.Ct. 917, 9 L.Ed.2d 922]; *Culombe* v. *Connecticut*, 367 U.S. 568, 583-584 [81 S.Ct. 1860, 6 L.Ed.2d 1037, 1046-1047]; *People* v. *Parham*, 60 Cal.2d 378, 385 [33 Cal.Rptr. 497, 384 P.2d 1001]; *People* v. *Berve*, 51 Cal.2d 286, 290 [332 P.2d 97].) ■ A frequently stated test is whether the behavior of the state's law enforcement officials was such as to overbear the defendant's will to resist and bring about a confession not freely self-determined. (*Rogers* v. *Richmond*, 365 U.S. 534, 544 [81 S.Ct. 735, 5 L.Ed.2d 760, 768]; *People* v. *Lopez*, 60 Cal.2d 223, 248 [32 Cal.Rptr. 424, 384 P.2d 16].) ■ Coercion can be mental as well as physical. (*Blackburn* v. *Alabama*, 361 U.S. 199, 206 [80 S.Ct. 274, 4 L.Ed.2d 242, 247].)

Evidence of the circumstances surrounding the confession in this case is not in conflict. It is our obligation to examine the uncontradicted facts in order to determine independently whether the confession was voluntary. (*Spano* v. *New York*, 360 U.S. 315, 316 [79 S.Ct. 1202, 3 L.Ed.2d 1265, 1267]; *People* v. *Trout*, 54 Cal.2d 576, 583 [6 Cal.Rptr. 759, 354 P.2d 231, 80 A.L.R.2d 1418].) We turn to the facts:

Mrs. Wilma McAfee, an elderly widow, was the manager of an apartment house in the central portion of Sacramento. At approximately 9 p.m. on January 11, 1962, Mrs. McAfee had a telephone conversation with one of the other tenants. On that same evening an automatic pistol was stolen from one of the apartments. Entry had not been procured by force.

No one had contact with Mrs. McAfee during the next day.

Between 6:30 and 6:45 in the evening Mrs. McAfee's daughter attempted to enter her mother's apartment but the door was locked. She secured a pass key hidden in a basement room and gained entrance. In her mother's bedroom she discovered her mother's body covered with a bedspread. A neckerchief with a double knot in the back was tied tightly around her neck. Mrs. McAfee had been garroted from behind and had died as the result of asphyxiation. A medical estimate placed the time of death between 8 p.m. and midnight the previous evening. Numerous abrasions and contusions had been inflicted upon her just before her death. Normally Mrs. McAfee kept the master key to the apartments on a long chain which was pinned with a safety pin to her belt. When her body was found the chain and the key were gone. There were no signs that her apartment had been forcibly entered. There was no evidence of sexual assault. Thirty dollars in cash and some valuable jewelry were found in the apartment. The apartment had not been ransacked. Mrs. McAfee's automobile was missing from the garage below the apartment and the car keys, normally kept in her apartment, were missing.

Defendant Barry Sigal was a tenant in the same apartment house. He was approximately 22 years of age, a large man weighing about 250 pounds. During the course of the January 12 evening on which Mrs. McAfee's body was discovered, Sacramento police searched his apartment. A hall light in the apartment was burning. In the sink and on the table were some dishes with remains of food. The bed was unmade. There were clothes and shoes in the closet.

Early in the morning of January 15 defendant Sigal drove Mrs. McAfee's automobile into a gas station in Jacksonville, Illinois, where he sold a set of tire chains to the station operator. He told the operator that he was delivering a friend's car to him in Springfield, Illinois. On January 20 the same automobile, a Dodge, was discovered abandoned in a parking lot in Springfield. The ignition was locked. In order to lock a Dodge automobile its key must be used. The car had not been "hot wired" to permit its use without a key. The car had 14 inches of snow on it. There had been no snow in the area since the 14th or 15th of January. Although the car had been wiped clean, defendant's fingerprints were found on a box of pills in the car and on the rearview mirror.

A complaint had been filed in the Sacramento Municipal Court on January 15 charging Sigal with Mrs. McAfee's

murder. As the result of this complaint a fugitive warrant was issued. Sigal was arrested in Seattle, Washington, during the morning of February 19. In his possession was the automatic pistol which had been stolen from the apartment house in Sacramento. Also in his possession were oil company credit cards in the name of M. G. Smith, which had been used to purchase gasoline for Mrs. McAfee's car at various points east of California.

After his arrest he was booked into the Seattle city jail and interrogated by an agent of the Federal Bureau of Investigation. The agent informed him that a murder charge had been filed against him, that he was not required to make any statement, that any statement he made would be used against him in court, that he had a right to call an attorney before making any statement. Sigal asked the F.B.I. agent to get him an attorney immediately. The agent replied that he could not do so, that such a matter was in the hands of the Washington authorities, that there was no public defender in Washington and that an attorney would be appointed when defendant was brought before a magistrate. Actually, Sigal was not brought before a magistrate in Seattle until February 28, nine days after his arrest.

On February 20, the day following Sigal's arrest, Robert Puglia, a deputy district attorney of Sacramento County, arrived in Seattle. He was accompanied by Officer Soski of the Sacramento Police Department. Puglia and Soski interrogated Sigal in the Seattle city jail for slightly over two hours on the afternoon of February 20 and again for somewhat over three hours starting at 9 o'clock that evening. The interviews were recorded on tape without Sigal's knowledge. During the course of the February 20 discussions Sigal told his questioners that he knew Mrs. McAfee and that he had been in her apartment on the night of January 11, which was the night of the murder. He said that he had been in her apartment watching television for about an hour commencing at 8 o'clock. He then left the apartment and took a city bus to the vicinity of a freeway, where he began hitchhiking south to Los Angeles. He said that he had remained in Los Angeles for several days and from there hitchhiked to Texas and Florida. He admitted that he had borrowed her master key to the apartment house and that he knew it was kept on a chain pinned to her dress. He denied having been in Illinois in January; denied taking Mrs. McAfee's car; denied ever having driven the car and denied knowing who

committed the crime.

The next day, February 21, Sigal underwent a polygraphic examination at 3 o'clock in the afternoon. He was interrogated by Puglia and Soski from 5:30 p.m. to 8 p.m. and from 9 to 10 p.m. Puglia repeatedly requested Sigal's cooperation and urged him to tell the truth. Shortly after commencement of the February 21 interrogation he reminded Sigal that he was implicated in the use of Mrs. McAfee's car, that his hitchhiking story the previous day could be "shot full of holes." Sigal inquired as to his position if a hypothetical third person had been involved, whom he knew only by his first name and who could not be found. He asked whether one person could be implicated in a murder committed by another simply by being connected with the use of the automobile. Puglia said that wasn't necessarily true, that "You have to have intent." Sigal asked whether Puglia believed him to be the one who killed Mrs. McAfee. Puglia said that he did.

At that point Sigal commenced to relate what later came to be called the "George story." He had met a man named George in a bar. Later he met George in a park. George said that he intended to rob Mrs. McAfee and wanted Sigal's assistance. He threatened Sigal and Sigal's family with harm and backed up the threat by showing a gun. He wanted Sigal to help him gain admission into the apartment building. He, George, would take the money from Mrs. McAfee and then tie her up and leave her in her car. At first Sigal objected, then agreed to participate in George's scheme. George and Sigal had a later meeting for further discussion of their plans. On the designated evening, after making sure that Mrs. McAfee was at home, Sigal let George into the back door of the apartment house. Sigal pointed out Mrs. McAfee's apartment. George walked to Mrs. McAfee's door and knocked on it. Sigal went to his own apartment and secured his clothing, after which he waited for George in Mrs. McAfee's car in the garage. Within half an hour George came to the car, gave Sigal the keys and ordered him to drive away. They left Sacramento at approximately 9:20 p.m. Sigal asked George where the money was and was told that there was very little. Sigal made it clear that he wanted his share of the loot. When they arrived at Springfield on January 15, George said goodbye and left Sigal after they had wiped down the car.

During the course of the George story Sigal described George's physical appearance in some detail. When his inter-

rogators expressed disbelief in the George story, Sigal disclaimed any worry because he had signed nothing. Later he inquired if the conversation had been taped. Puglia answered in the negative. Some days later, when Sigal was being returned to Sacramento, he told an accompanying officer that he was amused by the fact that his description of George was actually a description of Puglia.

The sleeping accomodation provided at the Seattle city jail was a cot without a mattress. Thus Sigal slept on bare metal springs on the night of February 19. During the first interview on February 20 he complained of physical soreness. This barbaric sleeping arrangement continued on the night of February 20. At the beginning of the February 21 interrogation he told his interviewers of his lack of sleep. The Sacramento officials had no apparent connection with this phase of Sigal's treatment. The recorded conversations indicate that Sigal was not selected as the special subject of maltreatment; rather, the denial of mattresses, however primitive, was a standard procedure at that jail.

Sigal complained mildly of the insufficient jail diet. There was no indication that he was starved or at all weakened by lack of food. Except for the effects of the metal bedsprings, he was not subjected to any physical discomfort or hurt.

During the interrogation Sigal expressed the wish that he were facing federal charges (rather than a murder charge). Apparently the federal charges would have been based on interstate transportation or use of a stolen credit card. At one point Puglia told him that the California authorities had no control over that aspect of the matter. At another, Soski inferred that federal charges were possible if it were actually proved that a third person (rather than Sigal) had committed the murder.

At the outset of the interrogation Sigal told Puglia and Soski that he was frightened by the serious charge against him, that he wanted a lawyer. The conversation then moved into the hitchhiking narrative. As the interviews proceeded, Sigal repeated his request for a lawyer approximately 20 times. He told his interrogators that he was worried by the possibly adverse effect of statements he was making. All requests for legal assistance were fended off by his interrogators, who assured him of the availability of the public defender in Sacramento after Sigal had been extradited to California. The following are some representative segments of conversation expressive of Sigal's requests for a lawyer:

"SIGAL: Well, I am stressing this to you. I did not kill that woman.

"SOSKI: All right.

"SIGAL: I didn't do it.

"SOSKI: Number one and number two. All right. Now, how about number three?

"SIGAL: That I don't know about. I got to see a lawyer. That's all there is to it.

" ..............................................

"SIGAL: Is there any way I can get a lawyer up here without any money?

"SOSKI: No, I don't. This is—this is—this—you have been here in—uh—this is my first trip to Seattle, Washington. I don't know—uh—I don't know their laws. I don't know any attorneys. I don't—only the people I have met here in this—uh—jail or in this police station.

"SIGAL: I just have got to see an attorney. I just got to see one.

"SOSKI: Why do you have to see one? Why is it so necessary that you see, oh—an attorney?

"SIGAL: Because I need advice. I need advice on what the hell I have to say or what the hell I should say. That's what.

"SOSKI: Barry, if you—if you're innocent, you know, by virtue of the fact that you are innocent, what—what you are supposed to say. You don't need somebody to tell—to tell you, uh—how to say the truth.

" ..............................................

"SIGAL: I can't say anything about that until I see a lawyer. Look fellows, I'm—I'm not going to hand—implicate myself in something as serious as this by my own admission, I'm going to—at least until I see a lawyer, some—something—now don't misconstrue—construe—uh—what I said now, I'm just saying I'm not going to say certain things.

" ..............................................

PUGLIA: Well, I'll tell you this, Barry. Ah,—you're going to be going to California, and—either the easy way or the hard way, and I am not threatening you when I say that—you've got a right to fight extradition, and it's of no moment to me what you do. But you are going to go down there and I'll lay you a hundred to one that you will, and when you get down there, if you come up with another story, then you're behind two eight balls. Now, if you've got an-

other story—a true story, you better let us have it.

"FULLER [a Seattle police officer] : Now is the time to tell us.

"SIGAL: I've got nothing to say. That's all there is to it. I got to see a lawyer.

" .............................................................

SIGAL: Because I—uh—let's face it, I need a lawyer.

PUGLIA : Well, have you something to hide ?

SIGAL: Uh—whether I have something to hide or not, is the—the simple fact is—uh—I got to have a lawyer."

Despite his insistence on legal help, Sigal did not refuse to talk, but continued to converse with his interrogators. At the beginning of the February 21 interviews he stated that he was willing to continue the conversations. On several occasions he said that he realized he was becoming involved and that he should speak to a lawyer before saying more; nevertheless, he continued to speak.

Sigal was indicted for murder. The tape recordings of the Seattle conversations were transcribed. At Sigal's jury trial in Sacramento Soski testified that the Seattle conversations had taken place and that these had been recorded and transcribed. There was extended *voir dire* questioning and reading of the transcript outside the jury's presence. Defense counsel then objected to any reading of the George story on the ground that it constituted an involuntary confession. The trial court ruled that the confession could be read to the jury and the issue of voluntariness submitted to that body. (*People* v. *Gonzales*, 24 Cal.2d 870, 876 [151 P2d 251].) Extensive excerpts from the Seattle interviews were then read to the jury. The reading occupied 274 pages of trial transcript. The court's instructions to the jury included instructions on the subject of coerced confessions and permitted the jury to accept or reject the confession. The jury returned a verdict finding Sigal guilty of second degree murder. A plea of not guilty by reason of insanity was withdrawn, judgment pronounced, and this appeal followed.

■ In one sense, the George story was a false confession. No one urged its literal acceptance upon the jury, and the jurors, by their verdict, demonstrated disbelief in its literal truth. Ordinarily a confession is "false" which untruthfully admits guilt. Such a confession is admitted not for the purpose of proving the matter falsely confessed, but for the limited purpose of proving something else, such as the witness' lack of veracity. (*People* v. *Liss*, 35 Cal.2d 570, 574 [219 P.2d

694

789] ; *People* v. *Ford*, 89 Cal.App.2d 467, 473 [200 P.2d 867].)
Sigal's "confession" was not of that sort. Viewed literally, it was not an avowal of guilt. It portrayed him as a distant auxiliary, not the prime mover in the murder. To a lawyer or court his story might implicate him as an accomplice, therefore liable as a principal in a murder physically committed by George. (Pen. Code, § 31.) To his lay mind, the absurd story was designed to fasten the onus of death on George alone. In this sense his declaration was an affirmation of his own innocence, not a confession at all.

The circumstances of the trial, however, decreed otherwise. Despite Sigal's futile attempt to hide behind the guilty George, the district attorney with commendable honesty told the jury that he was not attempting to convict Sigal as the aider and abettor in a homicide accomplished by George. He urged the jury not to believe the George story at all, that there was no other evidence of George's existence. He reminded the jurors that Sigal had admitted describing George in the physical image of the prosecutor himself. Thus he urged the jurors to "strike out George" and to accept the rest of Sigal's statement as a credible account of the murder. The confession, according to prosecution theory, was literally false and figuratively true.

Indeed, in the trial of the case, neither side displayed the slightest interest in the possibility that Sigal might be implicated as an accomplice to a murder committed by George. No jury instructions on that score were offered or given. If the jury had accepted the George story as literal truth, they might have acquitted Sigal. The point of the matter is that the George story was treated as an admission of guilt. Hence it formed a confession within the established definition. (See *People* v. *Speaks*, 156 Cal.App.2d 25, 34-35 [319 P.2d 709].) Its admissibility must therefore stand the scrutiny of the same test which applies to a true (and thus indubitably incriminating) confession.

 The demand for voluntariness, posed by the specific role Sigal's confession may have played in the jury's verdict, is buttressed by more general considerations. Historically, forced confessions were excluded because untrustworthy. (3 Wigmore on Evidence (3d ed.) § 822.) Modern concepts inject a constitutional coloration. Exclusion of confessions induced by threat or promise is equated with due process of law. Another theory of rejection is that our accusatorial system does not permit a defendant to be made the "delu-

ded instrument of his own conviction." (*Mapp* v. *Ohio*, 367 U.S. 643, 685 [81 S.Ct. 1684, 6 L.Ed.2d 1081, 1107, 84 A.L.R. 2d 933, 958], per Harlan, J., dissenting; *Culombe* v. *Connecticut, supra*, 367 U.S. at pp. 581-583 [6 L.Ed.2d at pp. 1045, 1046].) Whether the theory underlying the exclusionary rule is one of due process or something akin to self-incrimination, the reason for it is the same: to deter physical and psychological police coercion by making its fruits useless as a means of accomplishing convictions. (See *Blackburn* v. *Alabama, supra*, 361 U.S. at p. 207 [4 L.Ed.2d at p. 248]; *People* v. *Ditson*, 57 Cal.2d 415, 437-439 [20 Cal.Rptr. 165, 369 P.2d 714].) █ A false admission produced by coercion may be just as incriminating as a true admission. Either may result in conviction and either may reward the reprehensible methods which produced it. Thus, both falsehood and truth must stand the same test of admissibility. Due process bars conviction by use of a coerced confession without regard to its truth. (*Rogers* v. *Richmond, supra*, 365 U.S. at p. 544 [5 L.Ed.2d at p. 768]; *People* v. *Lopez, supra*, 60 Cal.2d at p. 248.)

█ In the appraisal of the circumstances of Sigal's confession, it is at once apparent that the investigators' methods fell far short of physical brutality or psychological torture. The court's duty to enforce constitutional protections does not cease in the face of relatively enlightened techniques. "It only becomes more difficult because of the more delicate judgments to be made." (*Spano* v. *New York, supra*, 360 U.S. at p. 321 [3 L.Ed.2d at p. 1271].) The decision rests to some extent upon the appellate judges' appraisal of a defendant's transitory psychic state when he told his tale of guilt. Either he had control, had power to choose between speech and silence, or he had become the brainwashed pawn of his interrogators—such are the psychological alternatives which bend the constitutional judgment. Appellate judges attempt this appraisal without seeing or hearing the accused or his questioners, with nothing before them but a typewritten trial transcript. Science might balk at a psychological diagnosis based on such incomplete data, at least when the case is closely balanced. However imprecise or difficult, the decision is a constitutional necessity.[1]

---

[1]See, for example, *Culombe* v. *Connecticut, supra*, 367 U.S. 568 [6 L.Ed.2d 1037], where the justices split 6 to 3 on the question of an overborne will, and *Haynes* v. *Washington*, 373 U.S. 503 [83 S.Ct. 1336, 10 L.Ed.2d 513], where the division over this issue was 5 to 4.

The psychological alternatives are not the only ingredients in the judgment. In weighing confession admissibility, the courts have continued to use the terminology of human volition, while basing their decisions in large part upon the acceptability of police conduct. Due process thus invests the word "voluntary" with connotations far broader than dictionary definitions. Preservation of freedom of the will is only one of several interests at stake. Another interest is the courts' rejection of confessions produced by illegal police action. The notion of an involuntary confession has become a "convenient shorthand" for describing a complex of values which underlies the determination of admissibility. (*Blackburn* v. *Alabama, supra,* 361 U.S. at p. 207 [4 L.Ed.2d at p. 248]; *The Supreme Court: 1960 Term,* 75 Harv.L.Rev. 40, 158-160; Paulsen, *The Fourteenth Amendment and the Third Degree,* 6 Stan.L.Rev. 411, 416-421.) A confession will be rejected which has been obtained by methods which offend the concept of due process. (*Haley* v. *Ohio,* 332 U.S. 596, 601 [68 S.Ct. 302, 92 L.Ed. 224, 229].) In harmony with decisions of the federal Supreme Court, California now follows the rule that a confession is involuntary if obtained under circumstances which denied the defendant any essential element of a fair trial or due process of law. (*People* v. *Ditson, supra,* 57 Cal.2d at pp. 437-440.)

One ground of attack on Sigal's confession is his alleged mental abnormality. During the Seattle interviews he told his interrogators that he had been under the care of a psychiatrist between the ages of 12 and 16, that he had had "troubles" ever since childhood. A polygraph specialist employed by the Seattle Police Department testified that, in his opinion, Sigal's polygraph charts were made by a person who had some kind of emotional or mental instability. (Propriety of this opinion testimony is not in issue.) He testified that Sigal was an "unfit subject" for polygraphic testing. A psychologist who had studied the relationship of mental disturbance to polygraphic responses testified that Sigal's polygraph charts were similar to those made by a psychotic person.

The influence of numerous variables in polygraphic testing has led the courts to place scanty trust in, and usually to exclude, opinion evidence based on such tests. (*People* v. *Carter,* 48 Cal.2d 737, 752 [312 P.2d 665]; Witkin, California Evidence, §§ 332-334.) Whatever might be the value of the polygraphic opinions in this case, that value is utterly

demolished by evidence that at the time of Sigal's testing the Seattle polygraph machine was in poor operating condition. Under the circumstances, evidence of mental illness or disturbance is too fragmentary and uncertain to assay its role in his confession.[2]

Interrogation during a prolonged period of incommunicado detention may be inherently coercive. (*Ashcraft* v. *Tennessee,* 322 U.S. 143, 154 [64 S.Ct. 921, 88 L.Ed. 1192, 1199].) Where a period of unbroken interrogation is not so extended as to be physically and mentally exhausting, its effect is considered in relationship to the totality of remaining circumstances, such as the age, experience, mentality and physical condition of the accused, as well as the conduct of the police. (See *Gallegos* v. *Colorado,* 370 U.S. 49 [82 S.Ct. 1209, 8 L.Ed.2d 325, 87 A.L.R.2d 614]; *Culombe* v. *Connecticut, supra,* 367 U.S. at pp. 623-627 [6 L.Ed.2d at pp. 1069-1072]; *Spano* v. *New York, supra,* 360 U.S. at pp. 321-322 [3 L.Ed.2d at pp. 1270, 1271]; *Blackburn* v. *Alabama, supra,* 361 U.S. at pp. 207-208 [4 L.Ed.2d at p. 249]; *People* v. *Speaks, supra,* 156 Cal.App.2d 25.) Sigal was fully aware of the murder charge and of his right to remain silent. The state's agents questioned him during four separate sessions over two days. No one of these sessions was more than three hours long. There were ample recesses between these sessions.

The steel bedsprings were briefly mentioned by Sigal as a complaint against conditions in the Seattle jail rather than as a cause of weariness and loss of alertness. He may have had little sleep, yet his responses to questions were careful and well conceived. He denied physical coercion, telling his interrogators: ''Well, you just—you've been treating me

---

[2]Evidence of a defendant's mental abnormality is admissible on the issue of coercion. (*People* v. *Isby,* 30 Cal.2d 879, 897-898 [186 P.2d 405]; *People* v. *Boyington,* 3 Cal.App.2d 655, 658 [39 P.2d 867]; Note 69 A.L.R.2d 348.) Attached to the record on appeal, but not in evidence, is a letter from a California psychiatrist concerning Sigal's mental condition. The psychiatrist was not called as a witness, nor have the People been afforded an opportunity to inquire into the accuracy of his statements. Where there is a ''vital flaw'' which warrants correction by extrinsic evidence, federal constitutional demands may entail reopening the record for additional testimony. (*Townsend* v. *Sain,* 372 U.S. 293, 312-313, [83 S.Ct. 745, 9 L.Ed.2d 770, 785-786, 788]; *Rogers* v. *Richmond,* 357 U.S. 220 [78 S.Ct. 1365, 2 L.Ed.2d 1361]; *Brown* v. *Allen,* 344 U.S. 443, 506 [73 S.Ct. 397, 97 L.Ed. 469, 514]; see also *United States* ex rel. *Rogers* v. *Richmond,* 252 F.2d 807, 810-811.) In view of the ultimate ground of our decision, Sigal's mental aberration, if any, is not crucial.

okay. You haven't been pushing me around. I can't complain about that." The George story was not blurted out as the sudden effusion of a mind dulled by physical exhaustion. Rather, Sigal carefully preceded it by a series of hypothetical questions dealing with its possible consequences. At the start of the George story, he was vigilant to detect a damaging question posed by Soski and declared that he would "pass" it. Later, as the George story unfolded, he remarked: "I think I'm nailing my coffin right now, because I am involved now," but continued with his narration. When he had finished, he chided himself: "Well, I don't know what to feel, because I don't know what's going to happen now, you see, because now I went against a cardinal rule. I copped out on myself. I copped out on myself and that is what I did." These and other portions of the recorded conversation depict a high level of awareness.

In sum total, Sigal's conflicting statements may demonstrate foolishness and lack of judgment. His predicament would have been bettered by silence; it was worsened by speech. Yet foolishness, poor judgment and self-destructive impulses are the inner qualities of many mortals. Such qualities emerge without coercion. Mr. Justice Frankfurter once remarked that the police may be midwife to a declaration naturally born of remorse, relief, desperation or calculation. (*Culombe* v. *Connecticut, supra,* 367 U.S. at p. 576 [6 L.Ed. 2d at p. 1043].) There is a well-recognized "compulsion to confess," an overpowering urge on a criminal's part to relieve himself of an intolerable inner burden of guilt. (*People* v. *Ditson, supra,* 57 Cal.2d at p. 435; 3 Wigmore on Evidence (3d ed.) § 851.) Sigal may have manufactured the George *alter ego* to blunt the sharp stab of revelation. To lay bare the exact source of the confession would require more psychiatry than judges should claim. Whatever its source, it was not a mind sapped of its resistive power by exhaustion or the physical conditions of the interrogation.

 Defense counsel contends that the deputy district attorney misled Sigal by assuring him that the George story would not implicate him in a murder charge. The apparent theory is that this was deception of a type likely to procure an untrue statement. (*People* v. *Atchley,* 53 Cal.2d 160, 171 [346 P.2d 764].) The record demonstrates that Puglia gave Sigal no guarantees. He correctly informed Sigal that the isolated fact of Sigal's use of Mrs. McAfee's automobile would not necessarily convict him of murder, but was "a

suspicious circumstance." In view of the California felony-murder rule, his statement, "You have to have intent," was inaccurate. He told Sigal, however, that aiding and abetting a third person would incriminate him. We find no material inducement and no deception at this point.

Deception is claimed in the deputy district attorney's statement that the conversations were not being recorded. The statement was made after the confession, thus did not influence it.

Puglia is also charged with deceiving Sigal by creating the impression that the latter was held on federal murder charges. The recorded conversation demonstrates otherwise. The federal fugitive warrant on which Sigal was arrested had been issued in response to a murder charge in the state courts. Puglia distinctly and correctly told Sigal that the character of the charge was a matter for decision by the state's officials.

Inducement by express or implied promises of lenience or immunity is urged as a basis for exclusion. (See *People* v. *Brommel,* 56 Cal.2d 629, 632 [15 Cal.Rptr. 909, 364 P.2d 845].) The record rebuts the contention. Sigal had expressed the wish that he were facing federal charges (rather than the California murder charge). The state agents told him that this might be a possibility, but made it clear that such a possibility would exist only if he established his innocence of the murder. He was urged to cooperate, to tell the truth; but there was no implication that a murder confession would buy him any advantage. At several points in the recorded conversations, Sigal acknowledged that his interrogators had promised him nothing. Persuasion is not the equivalent of improper inducement. (Cf. *People* v. *Ditson, supra,* 57 Cal.2d at p. 433.)

Denial of access to legal counsel does not alone render a confession involuntary. (*People* v. *Kendrick,* 56 Cal. 2d 71, 86 [14 Cal.Rptr. 13, 363 P.2d 13]; *People* v. *Crooker,* 47 Cal.2d 348, 353 [303 P.2d 753]; affd. in *Crooker* v. *State of California,* 357 U.S. 433 [78 S.Ct. 1287, 2 L.Ed.2d 1448].) Rejection of demands for legal counsel is a relevant circumstance in determining whether, under the facts of a particular case, a confession is involuntary. (*People* v. *Garner,* 57 Cal.2d 135, 149 [18 Cal.Rptr. 40, 367 P.2d 680].) That Sigal demanded legal counsel, that he was denied access to counsel, that he was jailed incommunicado for 60 hours until the state's agents had finished with him, are undeniable facts.

Washington law, like California's, requires that jail custodians grant an arrested person's request to communicate with an attorney. (Wash.Rev.Code, § 9.33.020, subd. (5); Cal. Pen. Code, §§ 825, 851.5.) Counsel for the People point out that Sigal's requests were made only to the California agents who did not have charge of him, rather than to the Washington authorities who did. Washington has not adopted the public defender system. Had Sigal been brought before a magistrate, demonstrated his indigence and requested appointment of counsel to represent him, we assume that such a request would have been fulfilled. It is also a fair assumption that the California agents' request for Sigal's appearance before a Seattle magistrate would have been honored. Absent such a request, the prisoner would have to schedule his own appearance before a magistrate, a consummation which he might devoutly wish but hardly fulfill. The California authorities had instigated his arrest, he was in their control, and his requests to them for legal counsel were enough. Twenty such requests were more than enough.

 When a murder is unwitnessed and only shreds of circumstantial evidence are found interrogation of a suspect may represent the only hope of solving the crime. "The alternative ... [is] to close the books on the crime and forget it, with the suspect at large. This is a grave choice for a society in which two-thirds of the murders already are closed out as insoluble . . . To subject one without counsel to questioning which may and is intended to convict him, is a real peril to individual freedom. To bring in a lawyer means a real peril to solution of the crime. ... [A]ny lawyer worth his salt will tell the suspect in no uncertain terms to make no statement to police under any circumstances." (*Watts* v. *Indiana*, 338 U.S. 49, 58-59 [69 S.Ct. 1347, 1357, 93 L.Ed. 1801, 1808-1809], per Jackson, J.; see *People* v. *Ditson, supra,* 57 Cal.2d at p. 434.) Required to weigh the necessities of effective criminal investigation against the rights of an accused, the courts exercise an individualized judgment in deciding whether absence of legal counsel is a coercive element in producing the confession.

 It is difficult to draw a line through the cases. Some of them turn on the fact that the interrogation was a "neutral inquiry" made in the course of a general investigation of the crime, rather than an attempt to fasten guilt on one who had already been selected for prosecution; others on the circumstance that the defendant had been formally indicted

or that he had already retained counsel; still others on the fact that the defendant had confessed without real insistence on legal advice. These decisions are collected and discussed in the majority and concurring opinions in *People* v. *Garner, supra,* 57 Cal.2d 135. More recent is *Haynes* v. *Washington, supra,* 373 U.S. 503 [10 L.Ed.2d 513], where the police held the defendant incommunicado, rejected his requests for permission to call an attorney and his wife and, although possessing enough evidence to justify a criminal charge, did not take him before a magistrate until he had confessed. Without reference to the defendant's physical or mental condition, the court rejected the confession, holding that "it was obtained under a totality of circumstances evidencing an involuntary written admission of guilt." (373 U.S. at p. 514 [10 L.Ed.2d at p. 521].)

Still more recent is *People* v. *Lopez, supra,* 60 Cal.2d 223, which sustained a police "show-up" between the time of arraignment and preliminary examination and in the absence of defense counsel. The court observed *arguendo*: "We do not believe that the accused has a right to have counsel present during purely investigatory activities *which are not designed to elicit information from the accused or otherwise impinge upon his constitutional rights.*" (Italics ours.) (60 Cal.2d at p. 243.)

Sigal was not yet a defendant in the sense that a formal indictment or information had been filed. (Cf. *Spano* v. *New York, supra,* 360 U.S. 315 [3 L.Ed.2d 1265].) Yet he was considerably more than a suspect. A verified complaint had been filed charging him with a capital offense. That complaint was the foundation of the warrant on which he was arrested in Washington. It was also the initial step in proceedings to secure his extradition from that state. (Pen. Code, § 1554.2.) By the time the Seattle interrogation commenced, the Sacramento authorities possessed weighty circumstantial evidence tending to connect him with the murder. The interrogation was no "neutral inquiry" designed merely to further investigation of an unsolved crime. It was designed to get incriminating statements from one already accused of murder except in the most technical sense. Indeed, at the trial Officer Soski frankly testified that the purpose of the Seattle trip was to obtain a confession from Sigal.

 Due process of law requires that a defendant in a capital case—Sigal was charged with murder—receive pretrial representation by counsel. (*Powell* v. *Alabama,* 287 U.S.

45 [53 S.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].) Of course the right to counsel is not confined to capital cases. (*Gideon* v. *Wainwright*, 372 U.S. 335 [83 S.Ct. 792, 9 L.Ed.2d 799].) ▮▮▮ Any person accused of crime in any California court is entitled to representation by counsel at all stages of the proceeding. (*In re Newbern*, 53 Cal.2d 786, 790 [3 Cal.Rptr. 364, 350 P.2d 116]; *People* v. *Dotson*, 46 Cal.2d 891, 895 [299 P.2d 875].) ''Accused'' in all except the most formal sense, Sigal had a full-blown constitutional right to legal representation when the interrogation commenced. Far from waiving the right, he repeatedly sought its fulfillment at the beginning and throughout the interviews. All his requests were shunted into conversational dead ends. The right was effectually denied him.

The right to counsel is a right to effective assistance. (*Glasser* v. *United States*, 315 U.S. 60, 76 [62 S.Ct. 457, 86 L.Ed. 680, 702]; *People* v. *Mattson*, 51 Cal.2d 777, 790 [336 P.2d 937].) Frequently the guidance and support of counsel are most sorely needed in the hours immediately following arrest. (*Spano* v. *New York, supra,* 360 U.S. at pp. 325-326 [3 L.Ed.2d at p. 1273]; *Crooker* v. *State of California, supra,* 357 U.S. at pp. 443-445 [2 L.Ed.2d at pp. 1456, 1457], dissent.) Even the most able trial advocacy may come too late to assist a defendant who has already spilled his mind to the police. So long as we maintain an accusatorial system of justice, one who stands accused of crime is entitled to have his demand for legal counsel fulfilled at the critical stages of the proceeding. (*Hamilton* v. *Alabama*, 368 U.S. 52 [82 S.Ct. 157, 7 L.Ed.2d 114]; see *People* v. *Lopez, supra,* 60 Cal.2d at p. 243; *People* v. *Garner, supra,* 57 Cal.2d at p. 160, concurring opinion.) In view of the harm a defendant may do his cause during post-arrest interrogation, later compliance with his requests for counsel may be nothing but an empty, ritualistic response to the echo of a constitutional mandate whose real voice has been ignored. If a defendant is so prejudiced by the denial of counsel ''as to infect his subsequent trial with an absence of 'that fundamental fairness essential to the very concept of justice,' '' he has been denied due process of law. (*Crooker* v. *State of California, supra,* 357 U.S. at p. 439 [2 L.Ed.2d at p. 1454].)

Sigal was fully aware of his right to remain silent; he had been warned that any statement might be used against him. Despite his repeated requests for an attorney, he did not choose silence, but continued to converse with his interrogators. Counsel for the People thus urge that his confession

was voluntary notwithstanding the requests for an attorney.

The contention ignores the constitutional concept which renders a confession "involuntary" if secured by unconstitutional police methods. The case was one which might involve the death penalty, and the accused had an absolute right to a lawyer's help at every stage in the proceedings. Although the help of a lawyer was requested repeatedly and in unmistakable terms, it was denied this defendant at a stage crucial to the course of all later proceedings. Through four sessions of interrogation he was held incommunicado and subjected to an examination which, through subtlety rather than harshness, effectually accomplished its aim of incriminating him out of his own mouth. By frustrating his requests for legal help, the state's agents were able to play upon his ego, his loquacity, his folly and his fears. Had he been accorded his constitutional right to effective legal assistance, there would have been no confession. The rejection of his requests for legal counsel when his need was most acute, that is, the denial of due process of law, was the indispensable element in producing the confession. Through unconstitutional means he was made the "deluded instrument of his own conviction." (*Mapp* v. *Ohio, supra,* 367 U.S. at p. 685 [6 L.Ed.2d at p. 1107].) We hold that the unconstitutional denial of the defendant's repeated and emphatic requests for legal representation resulted in a fundamental unfairness which infected his subsequent trial. It was a coercive circumstance without which the confession would not have been produced and which rendered the confession inadmissible.

An alternative rule, demanding exclusion of confessions produced under such conditions, may be in the process of emergence. The rule was advocated by 1958 dissenting opinions in *Crooker* v. *California, supra,* 357 U.S. at pages 441-448 [2 L.Ed.2d at pp. 1455-1459] and *Cicenia* v. *LaGay,* 357 U.S. 504, 511-512 [78 S.Ct. 1297, 2 L.Ed.2d 1523, 1529, 1530]. In brief, without reference to the voluntary-involuntary terminology, the rule would bar confessions obtained by persistent police grilling accompanied by denial of the right to legal counsel. In 1959 the same view was expressed by concurring opinions in *Spano* v. *New York, supra,* 360 U.S. at pages 324-327 [3 L.Ed.2d at pp. 1272-1274]. In the course of these three decisions, five present members of the federal Supreme Court espoused this ground of exclusion. It is discussed in *People* v. *Garner, supra,* 57 Cal.2d at page 151, and possibly foreshadowed by the dictum in *People* v. *Lopez, supra,* 60 Cal.

2d at page 243, quoted *supra*. It has the advantage of realism, because it refuses allegiance to psychological nomenclature and frankly acknowledges that exclusion of confessions, like exclusion of illegally seized evidence, may have its source in illegal police methods independently of the defendant's overborne will. (See Allen, *Federalism and the Fourth Amendment*, 1961 Sup.Ct.Rev. 1, 29-32.) If coercion in its ordinary connotation is not in issue, it permits the courts to find an appropriate line between investigatory practicalities and constitutional guarantees without having to fit the defendant's psyche into the pattern. Although the rule has not been adopted by either the federal or California Supreme Court, it is not inconsistent with the decisions of either tribunal. We refrain from adopting it here only because more orthodox concepts are available to redress the invasion of defendant Sigal's constitutional right to the assistance and protection of counsel.

■ Defendant asserts prosecution failure to establish a proper foundation for the reading of the lengthy excerpts of the Seattle transcript. As noted, the Seattle conversations were recorded on tape, then transcribed some weeks later. The transcriber was not called to the stand. Officer Soski testified that he had read the transcript before trial, that it was accurate and conformed to his memory of the conversations. This testimony sufficiently established the authenticity of the transcript and constituted an adequate foundation. (*People* v. *Ketchel*, 59 Cal.2d 503, 518 [30 Cal.Rptr. 538, 381 P.2d 394].) ■ The reading of selected portions by the deputy district attorney was an appropriate method of presenting it to the jury. (*People* v. *Costello*, 87 Cal.App. 313, 319 [262 P. 75 ].)

Other claims of error have their source in the particular exigencies of the trial and are not likely to arise on retrial. For that reason we give them no consideration.

Judgment reversed.

Pierce, P. J., and Schottky, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied December 18, 1963. Peek, J., did not participate therein.