Filed 12/17/20  P. v. Herrera CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JAIME BRAVO HERRERA,<br><br>    Defendant and Appellant. | F076586<br><br>(Super. Ct. No. DF012436A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth C. Twisselman II, Judge.

Timothy E. Warriner, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

A jury found appellant Jaime Bravo Herrera guilty of four counts of lewd or lascivious acts with a child under 14 years of age (Pen. Code, § 288, subd. (a)) against three victims, his nieces, Jane Doe 1 (JD1) (count 1), Jane Doe 2 (JD2) (count 2), and Jane Doe 3 (JD3) (counts 3 & 4). The jury also found true an allegation appellant committed said offenses against more than one victim (Pen. Code, § 667.61, subd. (e)(4)).

Appellant was sentenced to three consecutive prison terms of 15 years to life as to counts 1, 2, and 3 and one concurrent term of 15 years to life as to count 4.

On appeal, appellant contends the court erred by allowing the prosecutor to read excerpts of a transcript of a forensic interview JD1 gave approximately five years prior to the trial as a past recollection recorded exception to hearsay without laying a proper foundation. Appellant also contends the admission of these excerpts violated his Sixth Amendment right to confront and cross-examine JD1. Finally, appellant contends the court erred by not instructing the jury it was not permitted to use expert testimony of Child Sexual Abuse Accommodation Syndrome (CSAAS) to determine if the molestation claims were true (CALCRIM No. 1193). Finding no error, we affirm.

## FACTS

JD3 is appellant's wife's sister's daughter. At the time of trial, she was 20 years old. JD3 testified that she used to see appellant often at family get togethers. JD3 testified to three incidents that occurred in her home in McFarland, California, when appellant was visiting her family.

The first incident of molestation JD3 testified to occurred when she was in sixth or seventh grade. Appellant came up behind JD3 while she was watching other children play computer games and grabbed her buttocks. On another occasion, when JD3 was in eighth grade, she was in her kitchen and bent to pick something up. Appellant then put his hand inside her bra and touched her breast. He told her he liked her "boobies." On another occasion around the same time, JD3 was walking toward her mother's bedroom,

2.

and appellant went after her and threw her on her mother's bed. Appellant then lifted up JD3's shirt and put his mouth on her nipples. JD3 kneed appellant and ran to her bedroom. Appellant attempted to try to get into her room but eventually left. By the time she turned 14 years old, she told her parents what had happened.

JD2 and JD1 are siblings. Appellant is their uncle on their father's side.

At the time of trial, JD2 was 16 years old. JD2 testified when she was nine years old, at her grandmother's house in Delano, California, she was in the living room watching television and appellant sat next to her and touched her thigh. The next thing JD2 knew, appellant's penis was in her mouth. Appellant touched JD2 on her vagina and her breast on this occasion. On another occasion in California around the same time, appellant had sexual intercourse with JD2 in the bedroom of his house.

At the time of trial, JD1 was 18 years old. JD1 testified the first incident of sexual touching took place in Delano, California, in the living room of her grandmother's house before she was 13 years old. She said when she was sitting on the couch, appellant lifted up her bra and touched her breast and put his mouth on it.

On another occasion when JD1 was in elementary school, JD1 was in the laundry room at her grandmother's house, and appellant came in, pulled down his pants, and told her to perform oral sex on him. JD1 said no and believed appellant stopped attempting to get her to comply because his son went out in the yard near the laundry room. During a forensic interview, which occurred in Nevada pursuant to a separate investigation for crimes committed there, JD1 told the interviewer that during this incident appellant also put his finger in her vagina and penetrated her anus with his penis. At trial, JD1 had no independent recollection of appellant touching her in the laundry room on this occasion.

On another occasion at her grandmother's house when JD1 was about 10 years old, appellant pulled down JD1's pants and put his penis inside her. On another occasion, she was playing a video game with appellant's son, who had special needs, and appellant came in and pulled down her pants and her underwear and started kissing and doing

3.

"other stuff" to her vagina while his son was playing the video game. On another occasion in California, when JD1 was about 10 or 11 years old, she approached appellant to ask him something. Appellant told JD1 to turn around; he pulled her pants down and put his penis inside her.

When JD1 was in fifth or sixth grade, she told a friend about the sexual contact with appellant. Eventually she told her mother what happened. It was reported to Nevada police in 2013.

All three victims testified to uncharged incidents of molestation which took place in Las Vegas, Nevada. JD3 testified that when she was about 10 years old, appellant put his hand inside JD3's shorts and rubbed her vagina when they were swimming together at his house in Las Vegas. JD1 testified appellant put his penis inside her on two occasions in Nevada when she was nine or 10 years old. On another occasion when JD1 was approximately 11 years old, appellant grabbed JD1's foot, and rubbed it against his penis while they were sitting on the couch. JD2 also testified appellant penetrated her vagina with his penis in Las Vegas.

JD3 testified she knew JD2 and JD1 but did not talk to them often and had never talked to them about what happened with appellant. JD1 and JD2 said the same about JD3.

Mark Hoyt, a detective with the North Las Vegas Police Department Special Victims Unit, testified that in May 2013, a case involving JD1 and JD2 was assigned to him. Hoyt set up a forensic interview to be conducted at the Southern Nevada Children's Assessment Center (CAC) on June 11, 2013. Hoyt explained the CAC is "a safe place where children can go and be interviewed by a forensic interviewer" who specializes in sexual abuse. The CAC has forensic interviewers on staff to conduct the interviews. Kirsten DiNicola conducted the forensic interview with JD1. DiNicola is a certified forensic interviewer employed by the CAC. Hoyt testified, "By definition, a forensic interview through the national model is a legally sound and developmentally strategic

4.

way of obtaining information." It involves building rapport and obtaining information regarding any kind of physical, sexual abuse without asking a lot of leading questions. The interviewer tells the children to tell the truth and not guess or speculate and correct the interviewer if she gets something wrong. Forensic interviews were conducted of both JD1 and JD2. There are observation rooms where other investigators can observe the interview being conducted by the forensic interviewer. Hoyt observed JD1's interview in real time.

Clinical psychologist Michael Musacco, Ph.D., testified about the five stages of CSAAS, each consisting of a behavior that controverted an expectation of how a child victim of sexual abuse would behave. The first stage is secrecy where the child victim does not disclose the abuse right away. The second stage is helplessness where the child feels they cannot stop the abuse; an example of this is playing opossum during the act of being abused. The third stage is accommodation where the child resigns themselves to what is occurring and adapts to it in some way. This can occur in a number of ways and could include a child becoming depressed and suicidal or a child becoming a "perfect little adult[]" where they help with household responsibilities. The fourth stage is delayed or unconvincing disclosure where the child reports sometimes years later or into adulthood. The fifth stage is retraction, where the child takes back the account because of the aftermath the disclosure may have caused such as family rifts or Child Protective Services or law enforcement involvement.

## DISCUSSION

**I.    Admission of Excerpts from a Transcript of JD1's Forensic Interview**

Appellant contends the court erred by allowing the prosecutor to read portions of a transcript of appellant's interview with DiNicola under the past recollection recorded exception to hearsay. We disagree.

### A.    *Relevant Background*

During JD1's testimony regarding the incident in the laundry room where appellant tried to get JD1 to perform oral sex on him, the prosecutor asked JD1 if she told DiNicola that "[appellant] put his finger in [her] in the laundry room[?]" JD1 responded that she did not remember. The prosecutor showed JD1 a transcript of her 2013 forensic interview to refresh her memory. JD1 reported the transcript helped to refresh her memory "a little bit." The prosecutor asked, "Now, when you were in the laundry room, do you remember if anything else happened?" JD1 responded she did not but she remembered that she was wearing an Elmo sweater during the incident. The following colloquy occurred:

> "[PROSECUTOR:] . . . [H]ave you ever seen . . . a transcript of this interview prior to today?
>
> "[JD1:]  Not that I remember.
>
> "[PROSECUTOR:]  Have you listened to a recording of an interview that you gave to [DiNicola] in Las Vegas at the children's center?
>
> "[JD1:]  Not that I remember.
>
> "[PROSECUTOR:]  Let me ask you, what you just read, do you recall having that conversation with her?
>
> "[JD1:]  Yes.
>
> "[PROSECUTOR:]  And do you recall making those statements?
>
> "[JD1:]  Yes [¶] . . . [¶]
>
> "[PROSECUTOR:] . . . I gave you . . . Page 24 . . . 25, and 26 [with regard to the laundry room incident]. And those pages was that an accurate, I guess, transcription of what you said in that interview?
>
> "[JD1:]  Yes.
>
> "[PROSECUTOR:]  At the time that you did the interview when you were 13, were the events of what happened in the laundry room in Delano more fresh in your memory?

6.

"[JD1:] Yes."

The prosecutor then moved to admit the prior statement as a past recollection recorded. The court asked defense counsel if he needed a side bar. Defense counsel responded in the affirmative at which point an unreported sidebar conference was held. When the court was back on the record, the court asked defense counsel if he had an objection. Defense counsel responded, "I do, Your Honor." The court overruled the objection and stated, "We'll make a record on it later. You [prosecutor] may read. And let's do it question, answer." No record was ever made of the specific ground of defense counsel's objection.

Defense counsel stipulated to the prosecutor reading the transcript rather than having JD1 read it. In the portion of the transcript read, JD1 told DiNicola that along with attempting to get her to suck his penis, appellant "started penetrating [her], putting his finger in [her]."

After reading this portion of the transcript, the prosecutor asked, "is that accurate of what you said to [DiNicola]?" JD1 responded, "Yes." The prosecutor asked JD1 if she recalled appellant putting his finger in her body, and JD1 responded, "In the laundry room, I don't remember."

The prosecutor then asked JD1 if she recalled whether appellant turned her around and "did something to [her]." JD1 said no. JD1 said her memory would be refreshed by reviewing the transcript. After reviewing the transcript, JD1 said it did not refresh her memory as to anything else that happened in the laundry room. The following colloquy occurred:

> "[PROSECUTOR:] Were you truthful when you gave this statement to [DiNicola] in Las Vegas?
>
> "[JD1:] Yes.
>
> "[PROSECUTOR:] And she explained to you the need to tell the truth when you started your interview. Do you recall that?

7.

"[JD1:] Yes.

"[PROSECUTOR:] And were you honest with her?

"[JD1:] Yes.

"[PROSECUTOR:] And is this an accurate copy of the words that you said to her?

"[JD1:] Yes."

The prosecutor requested to read the rest of the statement via a stipulation from counsel that he can read it and pursuant to past recollection recorded. The court responded, "Before the stipulation, are you objecting to him reading that, [defense counsel]?" Defense counsel replied, "No, Your Honor." The court asked if he stipulated whether the prosecutor could read rather than ask the witness, and defense counsel responded in the affirmative.

The prosecutor then read a portion of the interview where JD1 told the forensic interviewer that appellant put his penis in her anus during that incident in the laundry room.

The prosecutor asked JD1 if she remembered appellant physically touching her body anywhere during the time in the laundry room based on her independent memory and JD1 replied in the negative.

### B. Past Recollection Recorded

The hearsay exception commonly referred to as past recollection recorded is set forth in Evidence Code[1] section 1237, which reads as follows:

"(a) Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement would have been admissible if made by him while testifying, the statement concerns a matter as to which the witness has insufficient present recollection to enable him to testify fully and accurately, and the statement is contained in a writing which:

---

[1] Further undesignated statutory references are to the Evidence Code.

8.

"(1)  Was made at a time when the fact recorded in the writing actually occurred or was fresh in the witness' memory;

"(2)  Was made (i) by the witness himself or under his direction or (ii) by some other person for the purpose of recording the witness' statement at the time it was made;

"(3)  Is offered after the witness testifies that the statement he made was a true statement of such fact; and

"(4)  Is offered after the writing is authenticated as an accurate record of the statement."  (§ 1237, subd. (a)(1)-(4).)

## C.    Analysis

"[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence, including one that turns on the hearsay nature of the evidence in question [citations]."  (*People v. Waidla* (2000) 22 Cal.4th 690, 725.)  " '[A] trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.' "  (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Appellant's only challenge to admission of the transcript excerpts is that proper foundation was not laid pursuant to section 1237, subdivision (a)(4).  He points out DiNicola did not testify.  He also contends JD1 could not have authenticated the transcript as accurate because she did not prepare the transcript and, as she did not remember the laundry room incident, she was incompetent to testify the transcript was accurate.  Appellant contends that without JD1's sufficient recall of the events, "the [trial] court was without a sufficient basis to conclude that the transcription was reliable."

As a threshold matter, we note that though appellant stated he had an objection following a side bar with the court before the prosecutor was permitted to read the transcript excerpts, we have no record of the side bar, and no grounds for objection were stated on the record.  For these reasons, and because no settled statement describing the

9.

contents of the side bar have been submitted to us, we are unable to determine whether the court was able to make an informed ruling on the foundation pursuant to section 1237, subdivision (a)(4). (*People v. Jackson* (2016) 1 Cal.5th 269, 367.) " 'A general objection to the admission or exclusion of evidence, or one based on a different ground from that advanced at trial, does not preserve the claim for appeal.' " (*Ibid*.; see *People v. Cowan* (2010) 50 Cal.4th 401, 465–466 (*Cowan*) [where a defendant objected to admission pursuant to § 1237, subd. (a)(3) below, argument regarding § 1237, subd. (a)(1) forfeited].) Further, appellant clearly declined to object to the second excerpt being admitted. For these reasons, we find the issue is forfeited. In any event, however, appellant's claim fails on the merits. We conclude the trial court did not abuse its discretion by admitting the excerpts read from the transcript of JD1's forensic interview.

For authentication of a document, the prosecution is only required to lay a "prima facie case" the writing is accurate. (See *People v. Goldsmith* (2014) 59 Cal.4th 258, 267–268.) " 'Prima facie evidence is that which will support a ruling in favor of its proponent if no controverting evidence is presented. [Citations.] It may be slight evidence which creates a reasonable inference of fact sought to be established but need not eliminate all contrary inferences.' " (*Krinsky v. Doe 6* (2008) 159 Cal.App.4th 1154, 1172, fn. 14.)

Here, JD1 testified she remembered making the statements in the transcript excerpts and the excerpts were an accurate transcription of what she said. We conclude this is enough for a prima facie case for accuracy. We disagree with appellant's contention that the transcriptionist was required to testify in order to lay the proper foundation under section 1237, subdivision (a)(4). A party to a recorded conversation may testify to the accuracy of a transcript. (*People v. Sigal* (1963) 221 Cal.App.2d 684, 704.) In *Seibert v. City of San Jose* (2016) 247 Cal.App.4th 1027, 1064-1065, the appellate court noted sufficient foundation for accuracy of a transcript of an interview was laid pursuant to section 1237 when the declarant testified she believed the transcript was accurate and that " 'I have no reason to say why they wouldn't report it the way it

was . . . I don't remember the conversation, so this is all I have to go on. Yes. I believe it's accurate.' " (*Seibert v. City of San Jose*, at p. 1065, italics omitted.) Here, the testimony of JD1 goes farther in that she testified she did remember making the statements and the transcript was accurate. Though we appreciate appellant's argument, we also acknowledge the trial court likely made a reasonable reconciliation of JD1's statements that she did not remember the details of the event in the laundry room but did remember making the statements to DiNicola enough to opine the transcript was accurate.

We note " '[t]he fact conflicting inferences can be drawn regarding authenticity goes to the document's weight as evidence, not its admissibility.' " (*People v. Goldsmith*, *supra*, 59 Cal.4th at p. 267.) Here, the defense made no attempt to affect the jury's assessment of the weight of the evidence despite having the opportunity. The defense did not cross-examine JD1 on her testimony of the transcript's accuracy. The defense did not question Hoyt, the prosecution's designated investigating officer who observed the interview in real time, and who was present in court for JD1's testimony on the transcript's accuracy. There is no evidence the transcript contained errors of the magnitude such that JD1 did not describe the acts of penetration referred to in the excerpts. To the contrary, the record demonstrates the transcript was in the possession of the defense and was prepared from a recording the defense likely had in its possession or at the very least had access to. We conclude this from the defense's own trial brief wherein defense counsel referred to the forensic interview explicitly, stated the interview was recorded, and described the contents of the interview in its recitation of the facts of the case, including the details of the laundry room incident. The defense clearly anticipated JD1 and JD2 would be testifying to the same events described in the interview. The defense could reasonably expect the transcript be used to refresh JD1's and JD2's memories and to possibly assist the defense in impeaching the witnesses if they were to give testimony inconsistent with what they said in their interviews. For

11.

these reasons, the accuracy of the transcript was important, and had there been concerns about the accuracy of the transcription, it appears the defense could have independently compared the transcript to the recording to confirm its accuracy. Based on this record, had there been serious errors in the transcription, the defense would have known and could have revealed them before trial, or at least during trial to affect the weight of the excerpts' effect on the jury's considerations.

Finding appellant forfeited the issue by not making a record of the grounds of his objection, and in any event, that the trial court did not abuse its discretion in implicitly finding the proper foundation had been laid, and considering the defense made no attempts to undermine the authenticity despite its opportunity to do so, we find no reversible error.

## II. Alleged Violation of Appellant's Federal Constitutional Right to Confront and Cross-Examine JD1

Appellant contends his Sixth Amendment rights to confront and cross-examine JD1 were violated by the admission of the transcript because he could not cross-examine JD1 about an incident she did not recall. Appellant concedes his argument was rejected by the California Supreme Court in *Cowan*, *supra*, 50 Cal.4th 401. He does not attempt to distinguish *Cowan*. Rather, he includes the argument "for the purpose of federalizing the issues herein and in the event this matter is impacted by a decision of the United States Supreme Court." Appellant points out the *Cowan* decision relies in part on *United States v. Owens* (1988) 484 U.S. 554, 559–560, which predates *Crawford v. Washington* (2004) 541 U.S. 36 and "more recent confrontation clause jurisprudence."

In *Cowan*, the California Supreme Court held there is no Sixth Amendment violation when a witness's statement of which he has no recollection is admitted pursuant to section 1237, and the defense has the opportunity to cross-examine the witness about the statement. (*Cowan*, *supra*, 50 Cal.4th at p. 468.)

We reject appellant's argument in light of our Supreme Court's decision in *Cowan*.

## III.    Alleged Instructional Error

Before Musacco's testimony, the court instructed the jury with CALCRIM No. 1193: "You may hear testimony from [Musacco] regarding [CSAAS]. [¶] Testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him. [¶] You may consider this evidence only in deciding whether or not an alleged victim of abuse . . . was not inconsistent with the conduct of someone who has been molested and in evaluating the believability of her testimony." The same instruction was given at the close of evidence.

Appellant contends by failing to instruct the jury that the testimony could not be used to determine if the allegations are true, the jury was permitted to find appellant guilty by a lesser standard than beyond a reasonable doubt. Appellant contends this failure violated his Fifth and Fourteenth Amendment rights to due process.

Although appellant failed to object to the instruction below, we will address the claim since " 'the issue raised asserts a violation of substantial constitutional rights.' " (*People v. Lopez* (2011) 198 Cal.App.4th 698, 708.) In any event, appellant's claim fails.

" 'When reviewing a supposedly ambiguous [i.e., potentially misleading ] jury instruction, " 'we inquire "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way" that violates the Constitution.' " ' " (*People v. Ayala* (2000) 24 Cal.4th 243, 289.) "We look to the instructions as a whole and the entire record of the trial, including the arguments of counsel." (*People v. Lopez*, *supra*, 198 Cal.App.4th at p. 708.) We also presume the jury followed the court's instructions. (*People v. Edwards* (2013) 57 Cal.4th 658, 746.)

We do not find the trial court's failure to use the specific words that "[CSAAS] evidence cannot be used to determine whether the molest[ation] claim[s] [were] true" lowered the prosecution's burden of proof or meant that the jury would have disregarded

13.

the beyond the reasonable doubt standard. We conclude the totality of the court's instructions and the rest of the record did not permit the jury to impermissibly use the CSAAS evidence to consider whether the victims' molestation claims were true. Accordingly, we reject appellant's claim that any of his constitutional rights were violated.

First, CALCRIM No. 1193 expressly prohibits the jury from using the CSAAS evidence to determine whether the defendant is guilty. We reject appellant's argument that "[t]he difference between using evidence to establish the complaining witnesses' credibility but not to establish [appellant's] guilt is a fine line virtually incapable of distinction." Rather, we conclude the only reasonable interpretation of the instruction as a whole is that jurors may use the evidence to evaluate the believability of the witnesses' claims in light of the evidence that they engaged in conduct seemingly inconsistent with the conduct of a child who had been molested after the molestations allegedly occurred. This is a permissible use of CSAAS evidence. As the California Supreme Court has recognized, while CSAAS evidence is not admissible to prove the complaining witness has in fact been sexually abused, it "is admissible to rehabilitate [the child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300.) The instruction tells jurors they should not necessarily discount complaining witnesses' testimony just because they exhibit behaviors described by CSAAS. CALCRIM No. 1193 does not mislead the jury into using CSAAS evidence for the impermissible purpose of determining that, because a witness exhibits the stages of CSAAS evidence, the molestation claims are true.

Further, there was ample testimony from Musacco underlining the proper way to use the CSAAS evidence. Musacco explained the "syndrome" is better described as a "theory" and that it is not used to prove or disprove whether or not somebody has been abused. He said:

14.

> "[T]here has been some misuses with this syndrome, and I always want to make it clear that I have no information about the defendant. I have no information about the alleged victim or victims. I'm not saying that they were actually abused. I'm not saying that the defendant was a perpetrator. This is generic to testimony that is used to describe the behavior of children who have been abused. But . . . I can't say because of this, then this child has been abused or this alleged perpetrator is guilty. [¶] That would be an absolute misuse of the syndrome, and I always try to make sure that I'm clear on that issue."

The prosecutor further clarified Musacco's comments by asking whether the syndrome is meant to dispel misnomers about how a child would react if they were abused. Musacco responded that was correct and "the syndrome was developed using . . . children who had actually been abused. But we can't go from those children who were abused and then take that information to say that the children here that we're talking about were definitely abused. We can't make that inference." On cross-examination Musacco again underscored that "people have unfairly used the syndrome to make it seem like a particular person is guilty, a particular person has been specifically abused. And that is a misuse of the syndrome."

The prosecutor further precluded any possible confusion on this front. He argued "Dr. Michael Musacco. Now, there's an instruction, and you should apply this testimony appropriately. It is not evidence of the defendant's guilt, [CSAAS]. And the reason is because when Dr. Musacco testifies the syndrome presumes that somebody was molested. So that's not what this case is about. I have to prove the charges beyond a reasonable doubt. The importance of this is if you have got some insight into a child and how a child perceives the world and how a child in certain studies in the field of psychology reacts to trauma and sexual abuse."

Finally, other instructions given to the jury precluded an impermissible use of the CSAAS evidence. The jury was instructed the People had to prove the case beyond a reasonable doubt. (CALCRIM No. 220.) They were also instructed they must judge the credibility or believability of the witnesses, using common sense and experience.

15.

(CALCRIM No. 226.)  They were given several factors by which to evaluate the witnesses' credibility including:  how well the witness was able to remember and describe what happened, their behavior while testifying, any potential influence by a personal relationship with someone involved in the case, how reasonable the testimony is in consideration with all other evidence, and whether the witness has engaged in other conduct that reflects on their believability.  (CALCRIM No. 226.)  The jurors were also instructed that before they conclude the testimony of one witness proves a fact, they should carefully review all the evidence.  (CALCRIM No. 301.)  The jurors were instructed that when certain evidence was admitted for a limited purpose, they must consider the evidence only for that purpose and for no other.  (CALCRIM No. 303.)  They were also instructed they could disregard any expert opinion they find unbelievable, unreasonable, or unsupported by the evidence.  (CALCRIM No. 332.)

For the foregoing reasons, we conclude it is not reasonably likely the jury applied the instruction in the impermissible manner appellant claims.  We find no instructional error and accordingly no violation of any of appellant's constitutional rights.

## **DISPOSITION**

The judgment is affirmed.


                                                              DE SANTOS, J.

WE CONCUR:


DETJEN, Acting P.J.


FRANSON, J.


16.